# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

STC.UNM,

        **Plaintiff,**

vs.                                     **No. 10-cv-1077 RB/WDS**

INTEL CORPORATION,

        **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendant Intel Corporation's Motion for Summary Judgment for Unenforceability and Memorandum in Support, filed January 19, 2012. (Doc. 178). Jurisdiction arises under 28 U.S.C. § 1338.  Having considered the submissions and arguments of counsel, relevant law, and being otherwise fully advised, the Court **GRANTS IN PART AND DENIES IN PART** Intel's motion.

## I.    Introduction

This case arises from Intel Corporation's (Intel's) alleged infringement of patent rights held by UNM.STC ("STC"), the patent arm of the University of New Mexico, relating to photolithography techniques used in the manufacture of semiconductors.  STC charges Intel with infringement of claim numbers 6 and 7 of United States Patent No. 6,042,998 ("the '998 patent"), entitled "Method and Apparatus for Extending Spatial Frequencies in Photolithography Images."  (Doc. 113 at 4, 10).

On January 19, 2012, Intel filed the instant Motion for Summary Judgment (doc. 178), asserting that the '998 patent is and always has been unenforceable as a matter of law. Specifically, it argues that the '998 patent is unenforceable because it and an earlier patent (U.S.

Patent No. 5,705,3231) ("the '321 patent") are not commonly owned, as required by a disclaimer

filed with the United States Patent and Trademark Office ("PTO") in connection with the '998

patent's issuance.  Intel asks the Court to grant summary judgment on this basis and to dismiss

STC's claim for infringement in its entirety.  In the alternative, Intel argues that if STC's

Response were to establish that common ownership of the patents arose at some point, the Court

should declare '998 unenforceable from its issuance until that date, precluding recovery of

damages for that period.

**II.      Factual Background**

      *A.      District of New Mexico Local Rule of Civil Procedure 56.1(b)*

    As a threshold matter, at the April 10, 2012  hearing held on the instant motion, counsel

for STC submitted that Intel's Reply failed to comply with Local Rule of Civil Procedure 56.1(b)

because it did not respond to each additional genuine issue of material fact set forth by STC in its

Response.  Local Rule 56.1(b) provides that "[a]ll material facts set forth in the Response will be

deemed undisputed unless specifically controverted."  D.N.M.LR-Civ. 56.1(b).  The Court

agrees that Intel failed to specifically respond to STC's statement of additional facts and will

therefore deem the majority of these facts undisputed.  However, several of STC's purported

factual statements are actually self-serving legal conclusions which the Court has disregarded in

consideration of this motion.

      *B.      History of the '321 and '998 Patents*

    In the early 1990's, Steven Brueck, Director of the University of New Mexico ("UNM")

Center for High Technology Materials, made certain inventions that were incorporated into

patent application SN 08/123,543 ("SN/543"), filed on September 20, 1993.  Three additional

co-inventors were listed on the application: (1) UNM employee An-Shyang Chu, (2) UNM employee Saleem H. Zaidi, and (3) Sandia Corporation Bruce L. Draper.  While prosecution of SN/543 was pending, however, the inventors terminated the application and incorporated its claimed inventions into a separate application.  This new application was filed on June 6, 1995, as a "continuation" of SN/543 and adopted SN/543's entire specification. It eventually issued as the '321 patent on January 6, 1998, naming the same four individuals as co-inventors.

On June 3, 1996 – approximately eight months following SN/543's termination – the four co-inventors filed a joint assignment of their interest in the "invention" of SN/543 to UNM. However, UNM soon realized that this assignment had been filed in error because co-inventor Bruce Draper, a Sandia Corporation employee, had mistakenly assigned his interest in SN/543 to UNM rather than to Sandia.  To correct the problem, UNM executed a new assignment transferring the interest "previously assigned to [it] by Bruce Draper" to "Sandia National Laboratories."  The second whereas clause of this assignment explained that "Bruce Draper was and is an employee of Assignee and the assignment from Bruce Draper to Assignor was made in error."  (Id.)  Although this assignment labeled "Sandia National Laboratories" as both the assignee and as Draper's employer, Draper in fact *worked* at Sandia National Laboratories but was *employed* by "Sandia Corporation."  (Doc. 178 at 7).

The PTO recorded the assignment from UNM to Sandia National Laboratories on October 22, 1996 – fourteen months after the SN/543 application was abandoned.  This assignment was never filed in connection with the '321 patent, despite its status as a "continuation" of SN/543 and incorporation of SN/543's entire specification.  Accordingly, the original patent documents associated with patent '321 refer to UNM as the sole assignee and

omit any mention of either Sandia Corporation or Sandia National Laboratories.

On September 17, 1997, '321 co-inventors Brueck and Zaidi filed a new patent application which eventually issued as patent '998, the subject of the instant litigation. UNM, which had obtained assignments of both Brueck and Zaidi's interests in '998[1], undertook its prosecution before the PTO. During prosecution, the PTO twice rejected the '998 application, finding that its claimed inventions were not patentable in light of the earlier-filed '321 patent and issuing a "double patenting" rejection on this basis. In doing so, it concluded that "[t]he subject matter claimed in the ['998 application] [wa]s fully disclosed in the ['321] patent" and "the ['998] claims, if allowed, would improperly extend the 'right to exclude' already granted in the ['321] patent." (Doc. 179-3, Ex. C at 5; Doc. 179-4, Ex. D at 5).

Although UNM initially argued against the rejection, it ultimately elected to file a "terminal disclaimer" to obtain issuance of the '998 patent. A terminal disclaimer is a mechanism by which a patent applicant can agree to shorten the term of his patent rights in order to overcome a double patenting rejection. *See* 35 U.S.C. § 253; 37 C.F.R. 1.321(c). In accordance with the requirements for terminal disclaimers outlined in 37 C.F.R. § 1.321, UNM's disclaimer stated that it was "the owner of record of a 100 percent interest in the instant application," disclaimed any term for the '998 patent extending beyond the term of the '321 patent, and stipulated that the '998 patent would "be enforceable only for and during such period that the instant application (or resulting patent) and the prior ['321] patent are *commonly*

---

[1]Sometime after the '998 patent application was first filed, UNM determined that two other UNM employees, Steve Hersee and Kevin Malloy, were also co-inventors on the patent. Both UNM and (later) STC petitioned the PTO to correct the list of inventors appearing on '998 after it issued. Because Hersee and Malloy had both assigned their interests to UNM before the patent issued, UNM represented itself as holding a 100% interest in '998 during its prosecution.

*owned*." (Doc. 179-5, Ex. E at 1) (emphasis added).  As required by 37 C.F.R. § 1.321(b), UNM

also agreed that the conditions of its disclaimer, including the common ownership requirement,

would "run[] with the Claims of any patent granted on the instant application and [be] binding

upon the grantee, its successors and/or assigns."  (Id.)  Based at least in part on the filing of the

terminal disclaimer, the PTO allowed the '998 patent to issue on March 28, 2000.  UNM was the

sole named assignee on the patent cover page.

In July of 2002, UNM assigned its entire interest in patent '321 to STC.  In August of

2007, UNM assigned its entire interest in patent '998 to STC.

In September of 2008, STC petitioned the PTO for a Certificate of Correction adding

language that would make patent '998 "a continuation-in-part of [patent '321]." (Doc. 179-12,

Ex. L at 5).  On December 30, 2008, the PTO granted STC's request and issued a Certificate of

Correction reflecting patent '998's continuation-in-part status.[2]

On June 22, 2009, STC and Sandia Corporation entered into a Commercialization

Agreement defining how the joint owners would work together to maintain, protect and

commercialize the invention of SN/543 and the '321 patent.  Sandia Corporation agreed that

STC would undertake all activities before the PTO and agreed to refrain from licensing the '321

patent itself.  Rather, it promised to refer all inquiries to STC, which was designated the

"Licensing Party."  Sandia Corporation was to receive a percentage of any licensing income.

The parties did not enter into any Commercialization Agreement regarding '998, however, as

STC considered itself the owner of a 100% interest in that patent.

---

[2]One effect of taking continuation-in-part status was to change '998's priority date to
coincide with the earlier priority date of '321.

Representing itself as the sole owner of '998, STC filed suit against Intel for infringement of its rights in the '998 patent on November 15, 2010.  (Doc. 1).

C.    *Summary of Arguments*

On summary judgment, Intel asserts that STC does in fact own 100% of the '998 patent, and that '998 is unenforceable because it has never shared common ownership with '321. According to Intel, while UNM's 1996 assignment to Sandia National Laboratories gave Sandia Labs an ownership interest in '321, Sandia Labs has never had any rights in '998.  Intel charges that this lack of common ownership violates the requirements of the terminal disclaimer upon which '998 was granted, which provided that '998 would be enforceable only so long as it was commonly owned with '321.  Common ownership, according to Intel, requires the *same set of entities* to own 100% of *both* the earlier patent – here, '321 – *and* the currently claimed invention – here, '998.  (Doc. 178 at 14-15; MPEP § 706.02(*l*)(2)).  Thus, because Sandia Labs has had an ownership interest in '321 since its issuance, but has never had rights in '998, '998 is unenforceable as a matter of law.

STC filed a Response on February 2, 2012, in which it asserted that upon reexamination of the patents, it discovered that it did in fact co-own patent '998 with Sandia *Corporation* and that prior representations to the contrary had been mistaken.  In total, STC's Response advances three alternate routes by which the Court may find the terminal disclaimer's common ownership requirement to be met.  First, STC contends that the two 1996 assignments operated to automatically give Sandia Corporation an ownership interest in '998 the moment it came into existence. Next, and in the alternative, STC asserts that the assignments transferred an ownership interest in '998 to Sandia Corporation in December of 2008, when the PTO issued the Certificate

6

of Correction making '998 a continuation-in-part of '321. Finally, STC argues that even were the Court to determine that Sandia Corporation did not co-own '998 through operation of the 1996 assignments, it recently executed a new assignment to Sandia Corporation dated December 1, 2011, which cured the ownership problem. In addition, STC contends that UNM's 1996 assignment to "Sandia *National Laboratories*" effectively transferred Draper's interest to "Sandia *Corporation*," which uses the name "Sandia National Laboratories" as a d/b/a. Thus, according to STC, Sandia Corporation – not Sandia National Laboratories – co-owns both the '321 patent and the '998 patent with STC.

Intel levies numerous arguments in response to STC's propositions, which the Court will address below. Most significantly for the purposes of this motion, Intel argues that STC's recent assignment to Sandia Corporation fails to remedy the ownership problem because '321 is now jointly owned by STC, Sandia Corporation, and Sandia *National Laboratories*, whereas '998 is jointly owned only by STC and Sandia Corporation. According to Intel, Sandia National Laboratories is a distinct entity from Sandia Corporation – it is not, as STC contends, a d/b/a. Thus, Intel argues that STC's most recent assignment fails to create common ownership and summary judgment is appropriate.

The Court held oral argument on the motion on April 10, 2012. STC and Intel each filed an additional surreply on April 11, 2012 (doc. 202), and April 18, 2012 (doc. 204), respectively. The matter is now ready for decision.

## III.    Standard

Summary judgment is appropriate where the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P.

56(a).  "A fact is 'material' if under the substantive law it could have an effect on the outcome of

the lawsuit.  An issue is 'genuine' if 'a rational jur[or] could find in favor of the nonmoving

party on the evidence presented.' " *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242,

1246 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir.1998).

 "A party asserting that a fact is genuinely disputed must support this assertion by citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or

other materials."  FED. R. CIV. P.56(c)(1)(A).  If a party fails to properly support an assertion of

fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the

court may consider the fact undisputed for purposes of the motion.  FED. R. CIV. P. 56(e) &

56(e)(2).

The movant – in this case, Intel – carries the initial burden of showing that no genuine

issue of material fact exists. *Id.* at 1246; *Adler*, 144 F.3d at 670.  This burden may be discharged

by showing there is an absence of evidence to support the nonmoving party's case. *Celotex

Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the movant meets this initial burden, the burden

then shifts to the non-moving party – here, STC  – to find sufficient evidence that would warrant

submission of the case to a trier of fact.  *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d

1022, 1024 (10th Cir. 1992).  "Evidence is sufficient to withstand summary judgment if it is

significantly probative and would enable a trier of fact to find in the nonmovant's favor." *Adams*,

233 F.3d at 1246.  In making this determination, the trial court must "view the evidence and

draw reasonable inferences therefrom in the light most favorable to the non-moving party."

*Simms v. Oklahoma ex rel. Dept's of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321,

1326 (10th Cir. 1999).

## III.    Discussion

###    A.    *Judicial Estoppel*

Intel asserts that STC should be judicially estopped from denying sole ownership of the '998 patent before December 1, 2011, because it has reaped the benefits of repeatedly and successfully asserting the opposite. The Court declines to consider application of judicial estoppel in the instant matter because, as explained below, the undisputed facts establish that UNM/STC solely owned the '998 patent from its issuance until December 1, 2011.

###    B.    *Patents '321 and '998 were not Commonly Owned Prior to December 1, 2011*

STC offers two arguments to support its contention that patents '321 and '998 were commonly owned prior to December 1, 2011. Both fail as a matter of law.

STC first contends that the language of the two 1996 assignments, specifically the terms "invention" and "issued thereon," operated to automatically give Sandia[3] an interest in patent '998 the moment it came into existence. The first assignment, from Draper to UNM, reads:

> Assignors [including Bruce Draper] do hereby sell, assign, and transfer unto Assignee [UNM] all their right, title, and interest in and to the <u>invention [SN/543]</u> in the United States and in all foreign countries and their entire right, title, and interest in and to any and all Patents which may be <u>issued thereon</u> in the United States and in any and all foreign countries and in and to any and all divisions, reissues, <u>continuations</u>, and extensions thereof.

(Doc. 179-25, Ex. X at 3) (emphases added).

The second assignment, from UNM to Sandia National Laboratories, reads:

---

[3] For the purposes of this section, the Court will use the term "Sandia" rather than referring to "Sandia Corporation" or "Sandia National Laboratories." The distinction between them, which is critical to STC's post-December 2011 argument, is irrelevant to the Court's pre-December 2011 analysis.

> Assignor [UNM] does hereby sell, assign, and transfer unto Assignee [Sandia] those <u>rights and interests previously assigned to Assignor by Bruce Draper</u> in the United States and in all foreign countries and to any and all Patents which may be <u>issued thereon</u> in the United States and in any and all foreign countries and in and to any and all divisions, reissues, <u>continuations</u>, and extensions thereof.

(Doc. 179-26, Ex. Y at 3) (emphases added).

According to STC, Draper's assignment of the "invention" of SN/543, which was subsequently assigned to Sandia, automatically carried with it an assignment of any resulting patents – including patent '998. The word "invention," STC asserts, incorporates all of the invention's "incidents," *Hendrie v. Sayles*, 98 U.S. 546, 554-55 (1879), including "all alterations and improvements and all patents whatsoever, issued and extensions alike, to the extent of the territory specified in the instrument." *E.I. Du Pont de Nemours & Co. v. Okuley*, 2000 U.S. Dist. LEXIS 21385, at *80 (S.D. Ohio Dec. 21, 2000) (citing *Hendrie*, 98 U.S. at 554). Because patent '321 incorporated SN/543's entire specification, and because the PTO determined that '998's content was "fully disclosed" in '321, STC argues that patent '998 incorporates the "invention" of SN/543 and is one of the "[p]atents which may be issued thereon in the United States." (Doc. 179-25, Ex. X at 3). Therefore, when '998 came into existence, Sandia's ownership interest vested automatically.

In the alternative, STC contends that the 1996 assignments gave Sandia an interest in all "continuations" of the SN/543 invention, and that once the PTO issued the Certificate of Correction making '998 a "continuation-in-part" of '321, it became a "continuation" of SN/543 within the meaning of the assignment language. At that point, according to STC, Sandia automatically gained an ownership interest in '998.

Intel asserts that both of these ownership theories fail because ownership rights must

10

derive from *inventorship*.  (Doc. 192 at 3-4) (citing *Bd. of Trs. of the Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.* 131 S.Ct. 2188, 21994-95 (2011)).  It argues that although other parties may later acquire rights in an invention, these rights must find their origin in an inventor him or herself.  It is undisputed that Draper did not co-invent any claims of the '998 patent.  Thus, according to Intel, Draper had no ownership interest in patent '998 to assign.  The Court agrees with Intel.

It is bedrock principle that one cannot assign what one does not have.  *See, e.g.,* MPEP § 301 ("Each individual inventor may only assign the interest he or she holds.")  Draper can, and did, assign all of *his* rights in the "invention" of SN/543 to Sandia[4], as well as *his* rights in patents "issued thereon" SN/543 and *his* rights in continuations thereof.  On summary judgment, it is Intel's burden to show that based on the parties' undisputed material facts, these rights did not include a valid, undivided ownership interest in '998.  The Court finds that Intel has met its burden and holds that Sandia did not co-own patent '998 with UNM or STC at any point prior to December 1, 2011.

First, Draper's rights in the "invention" of SN/543 and patents "issued thereon" did not encompass an undivided ownership interest in patent '998.  Both the Supreme Court and the Federal Circuit have held that rights to an invention initially belong to the inventors alone.  "[A]lthough others may acquire an interest in an invention, any such interest – as a general rule – must trace back to the inventor."  *Roche*, 131 S.Ct. at 2195; *see also Beech Aircraft Corp. v. EDO Corp*., 990 F.2d 1237, 1248 (Fed. Cir. 1993) ("At the heart of any ownership analysis lies the question of who first invented the subject matter at issue, because the patent right initially

_____

[4]Via the chain of assignments from Draper to UNM, and from UNM to Sandia.

vests in the inventor who may then, barring any restrictions to the contrary, transfer that right to

another . . . ."); MPEP § 301 ("The ownership of the patent (or the application for the patent)

initially vests in the named inventors of the invention of the patent . . . . The patent (or patent

application) is then assignable by an instrument in writing . . . .") (quotation omitted).

STC concedes that Draper did not co-invent any claims in the '998 patent.  (Doc. 187 at

12).  It sidesteps the apparent implication of this concession – that Draper had no rights in '998

to assign – by arguing that "questions of patent ownership and inventorship are distinct issues,"

and that each common inventor of an application is permitted to assign his interest in the *whole*

patent to a third party – not only those parts to which he himself contributed.  This is because "a

joint inventor as to even one claim enjoys a presumption of ownership in the entire patent."

*Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1466 (Fed. Cir. 1998).  Thus, STC argues

that when Draper assigned his rights in the "invention" of SN/543 to UNM, which subsequently

assigned those rights to Sandia, Sandia "took an ownership interest in every future patent

irrespective of whether Draper made any inventive contribution to any or all of those patents."

(Doc. 187 at 12).

STC's argument goes too far.  That Draper enjoyed a presumption of ownership over the

entire SN/543 invention does not empower him to assign rights in all future patents, in

perpetuity, that can be traced back to SN/543 regardless of any inventive contribution.  Again,

Draper cannot assign what he does not have.  By STC's logic, Draper (and by virtue of

assignment, Sandia) would take an automatic ownership interest in any future patent arising in

SN/543's ownership chain no matter how remote from his original invention.  Patent '998 is

itself two steps removed from SN/543; it is a continuation-in-part of a continuation of SN/543.

Nothing STC offers would preclude Draper/Sandia from automatically claiming an ownership interest in a continuation-in-part of patent '998, or in a continuation-in-part of that continuation-in-part. The history of the PTO is filled with long and convoluted chains of ownership. *See, e.g.*, *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 960 n.4 (Fed. Cir. 2001) (patent at issue was a continuation-in-part of a continuation of a division of a great-grandparent application); Mark A. Lemley & Kimberly A. Moore, *Ending Abuse of Patent Continuations*, 84 B.U. L.REV. 63, 107 (2004) (discussing a patent which claimed to be a continuation-in-part of seventeen different applications, each with its own priority chain). Given this fact, the practical impact of STC's blanket proposition is largely unworkable. It would grant inventors of original applications ownership interests in every patent arising in the ownership chain, through generations of continuations or continuations-in-part, affording them the right to exclude others from practicing inventions far removed from their own original conceptions and to which they made no contribution – inventive or otherwise.

STC somewhat attempts to restrict the implications of its argument by stressing that the *commonality* between SN/543 and '998 makes '998 a patent "issued thereon" the SN/543 invention, thus providing a direct connection to support Draper's interest in '998.[5] Specifically, it asserts that the PTO's determination that "[t]he invention of the '998 patent was 'fully disclosed' in the '321 patent and therefore in the SN/543 patent application" grants '998 status as

---

[5]STC also states that patent '998 " 'incorporated by reference the entirety of the '321 patent.' " (Doc. 187 at 8). While true, patent '998 also incorporated by reference 15 additional works, including basic treatises like *Introduction to Fourier Optics* and *Introduction to Microlithography*. (*See* Doc. 179-7, Ex. G, Col. I at 5-55). STC does not assert that the authors or inventors of these 15 additional references have rights in the '998 patent. Thus, the Court does not find this fact to be persuasive.

a "resulting" patent or a patent issued "on" the invention of SN/543. However, STC still fails to explain why Draper himself has an interest in '998, even assuming it is a patent issued "on" the SN/543 invention, despite not being a named inventor. In addition, STC cites no authority establishing that the PTO's finding of common subject matter between '998 and '321 has independent legal force in this context. Rather, STC's "issued thereon"/commonality argument effectively replaces the question of *inventorship* with an inquiry into patent *content*. STC appears to argue that because Draper had full rights to the SN/543 "invention," at least some of which the PTO determined made its way into the '998 patent, he is automatically granted a right to the entirety of '998. However, this argument implicitly raises questions regarding "how much" content-overlap or "what type" of PTO finding is required to support transfer of an original inventor's ownership interest, which STC fails to address. More critically, even assuming the existence of a significant content-overlap between SN/543 and '998, STC provides no authority to suggest this overlap affords Draper an undivided ownership interest in '998 absent a single inventive contribution to the claims of that patent[6]. It is axiomatic in patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). STC admits that Draper made no contribution to '998's claims. Therefore, as a matter of law, Draper's rights in the "invention" of SN/543 and in patents "issued thereon" do not include an undivided ownership interest in patent '998.

    The same flaw pervades STC's alternative argument, that Draper had a valid interest to

---

[6]STC does not argue that Sandia has rights only in the common subject matter; it argues that the 1996 assignments gave Sandia undivided ownership rights in the entirety of '998.

assign Sandia in patent '998 as a "continuation" of SN/543.  Even assuming patent '998 – which is a continuation-in-part of a continuation of SN/543 – is encompassed within the assignments' "continuation" language, STC still fails to provide a legal basis explaining why Draper can automatically claim an undivided ownership interest in a patent he did not invent.  Despite STC's proffer of numerous cases meant to support the proposition that common owners of an invention "enjoy common ownership in continuing patents," (doc. 202 at 2), STC cannot provide a single instance of an inventor claiming an ownership interest in a continuing patent to which he or she concededly made no inventive contribution.

Based on the parties' undisputed material facts, Draper had no undivided ownership interest in patent '998 to assign because he made no inventive contribution to the claims of that patent.  Because Sandia is entitled to no more than Draper's interest in '998, as a matter of law, Sandia did not co-own '998 with UNM or STC prior to December 1, 2011.

C.    *Factual Issues Remain Regarding the Current Ownership of Patent '321*

Having found that Sandia did not co-own patent '998 with UNM or STC by operation of the 1996 assignments, the Court must next consider whether STC's December 1, 2011 assignment of an undivided interest in patents '998 and '321 to Sandia Corporation served to cure the defect in ownership.  To prevail on its motion, Intel must show that there is no genuine dispute as to any material fact and that notwithstanding STC's recent assignment, patents '998 and '321 remain owned by different entities as a matter of law. The Court finds that Intel cannot meet this burden and therefore denies Intel's motion for summary judgment for the period following December 1, 2011.

On December 1, 2011, STC executed the following assignment naming "Sandia

15

Corporation" as the assignee:

> Pursuant to the ASSIGNMENT dated October 15, 1996 and related documents and events, STC.UNM and Sandia Corporation are and have been since at least December 30, 2008 common owners of both U.S. Patents Nos. 5,705,321 and 6,042,998.

> STC.UNM wants to protect the parties interests in the above patents against all possible challenges, therefore in an abundance of caution, STC.UNM, confirms the prior assignment and, in view of the above premises and good and valuable consideration the receipt of which is hereby acknowledged, <u>also hereby assigns an undivided interest in each of U.S. Patents Nos. 5,705,321 and 6,042,998 to Sandia Corporation</u>.

(Doc. 179-31, Ex. DD) (emphasis added).

The practical effect of this assignment is uncontested: it conveyed an undivided interest in '998 and '321 to Sandia Corporation as of December 1, 2011. The critical question for the Court is whether UNM's1996 assignment to Sandia *National Laboratories* ("Sandia Labs") functioned to split ownership of '321 between STC and Sandia Labs *prior* to December 1, 2011. If this is the case, as Intel urges, then '321 is currently owned by three entities – STC, Sandia Labs, and Sandia Corporation – whereas '998 is owned only by STC and Sandia Corporation. In this scenario, the terminal disclaimer requirement of common ownership remains unmet and '998 remains unenforceable.

In support of its contention that the 1996 assignment conveyed an ownership interest in '321 to Sandia Labs, Intel first points to the plain language of the assignment. And rightfully so; the second, "corrective" 1996 assignment undisputedly lists "Sandia National Laboratories" as the assignee of Draper's interest in SN/543. According to Intel, this assignment effected a valid transfer of ownership to Sandia Labs, which Intel contends is an independent legal entity currently holding title to a variety of physical and intellectual property interests.

Intel cites numerous sources to support its characterization of Sandia Labs' legal status. First, the Sandia Labs website itself clearly states that it and Sandia Corporation are distinct entities: "Sandia [Labs] 'is a government-owned/contractor-operated (GOCO) facility," whereas "Sandia Corporation, a Lockheed Martin company, manages [Sandia Labs] for the U.S. Department of Energy's National Nuclear Security Administration." (Doc. 192 at 11). Second, Intel points to "numerous federal statutes" recognizing Sandia Labs as a "federal agency." (Id.) Third, it cites to several Tenth Circuit cases which "recognize[] the distinction between Sandia National Laboratories (the federal agency) and Sandia Corporation (the privately held company that currently operates the Laboratories under a federal contract." (Id.) Fourth, it points to the "Assignments" page of the PTO website, which shows that Sandia Labs has been named a patent assignee 323 times. (Doc. 193-1 at 2). Finally, it cites 42 U.S.C. § 5908, which vests title to any invention "made or conceived in the course of or under any contract of the Secretary" in the United States, for the proposition that Sandia Corporation does not automatically own inventions by inventors employed at Sandia Labs. Thus, according to Intel, there is no reason to presume that an assignment to Sandia Labs equals an assignment to Sandia Corporation.

On its face, Intel's proffered evidence is highly persuasive. Deeper examination, however, reveals several significant problems. With regard to the Sandia Labs website, for example, although the website does make a clear distinction between Sandia Corporation and Sandia Labs, it provides no indication that Sandia Labs is an independent legal entity, capable of, or holding title to property. Rather, the material cited by Intel and viewed on the website supports the proposition that the *federal government* owns Sandia Labs and its associated property. Second, none of the federal statutes Intel cites actually refer to Sandia Labs as a

17

federal "agency." In large part, they list Sandia Labs as a "facility" owned by the federal government. When the Court raised this point during oral argument, counsel for Intel acknowledged that the labs likely could not be characterized as an "agency," but suggested Sandia Labs could be some other governmental entity without attempting greater specificity. Third, the Tenth Circuit cases cited by Intel refer to the distinction between Sandia Labs and Sandia Corporation but once again do not suggest that Sandia Labs can own property. One of cases Intel cites, for example, expressly states that "[t]he United States government owns all of the land, buildings, and other property as [Sandia Labs]." *Domme v. United States*, 61 F.3d 787, 188 (10th Cir. 1995). Fourth, although the PTO Assignments webpage does list Sandia Labs as an assignee 323 times, when the Court further inspected these individual assignments, a large number showed assignments from individual inventors to Sandia *Labs*, and then from Sandia *Corporation* to the Department of Energy. In many of these, the PTO website showed no record of assignment from Sandia Labs to Sandia Corporation, begging the question of how Sandia Corporation was able to assign ownership interests in patents belonging to a separate legal entity.[7] Furthermore, Intel's attached list of assignments fails to reflect that there are two separate Sandia Labs facilities: one in California and one in New Mexico, both operated by Sandia Corporation. In examining the PTO website, the Court observes that both individual laboratory locations ostensibly receive assignments. This raises the question: does an

---

[7] Explanation for this observation may lie in STC's contention, discussed below, that parties have a practice of labeling "Sandia Labs" as the assignee on assignment cover sheets while identifying "Sandia Corporation" as the real party in interest on underlying patent documents. Even assuming this to be the case, however, these records evidence ambiguity in the PTO Assignments webpage and detract from the persuasive value of Intel's assignment record argument.

assignment to the Sandia Labs in Livermore equal an assignment to the Labs in New Mexico?

Are they a single "entity," or are they two?  Finally, while Intel's citation to 42 U.S.C. § 5908

may support its position that an assignment to Sandia Labs should not be "presumed" to be an

assignment to Sandia Corporation, it also further strengthens the notion that the United States

government – in which title to these inventions automatically vests – also owns title to associated

laboratory property.[8]

 STC's case fares little better.  STC rests its argument on the assertion that Sandia Labs is

the d/b/a name for Sandia Corporation, as well as a trademark and the name for the *facilities*

used by Sandia Corporation.  Sandia Labs cannot, according to STC, legally hold title to patents.

In support of its position, STC first cites to the deposition testimony of Kevin Bieg, a Fed. R.

Civ. Pr. 30(b)(6) witness for "Sandia," who states that Sandia Corporation "do[es] business as

Sandia National Laboratories" and that most of the public "knows [it] as Sandia National

Laboratories."  (Doc. 187 at 2).  STC then cites to a number of Sandia Corporation filings in

unrelated prior cases in which Sandia Corporation represented that Sandia Labs was its d/b/a

name.  Finally, STC's surreply attaches a sample of 20 patents previously identified by Intel as

---

[8] Intel's Surreply also includes a footnote stating that 15 U.S.C. § 3710(e)(5) requires Sandia Labs to transfer certain intellectual property rights to users in the private sector pursuant to Sandia Labs' membership in the Federal Laboratories Consortium for Technology Transfer. Intel suggests that this requirement would "make no sense" if Sandia Labs could not hold patent rights.  Upon reviewing 15 U.S.C. § 3710(e)(5), the Court does not find this statute to establish Sandia Labs' ability to own patent rights.  It further observes that the requirement does make sense if the labs are transferring property rights from the United States government, or a particular federal agency such as the Department of Energy, to private users. *See, e.g.*, 15 U.S.C. § 3710(a)(1) ("It is the continuing responsibility of the Federal Government to ensure the full use of the results of the Nation's Federal investment in research and development. To this end the Federal Government shall strive where appropriate to transfer *federally owned or originated technology* to State and local governments and to the private sector.") (emphasis added).

being "assigned" to Sandia Labs, and shows that the underlying patent documents actually transferred ownership of these patents to Sandia *Corporation*. STC contends this evidence establishes that Sandia Corporation had a practice of printing "Sandia Labs" on assignment cover sheets, but identifying "Sandia Corporation" within the assignments as the real party in interest. (Doc. 202 at 2). STC argues that this interchangeable use of the two designations to refer to the same entity confirms that Sandia National Laboratories is indeed a d/b/a of Sandia Corporation.

As was the case with Intel, STC's arguments have some persuasive weight. They also, however, have problems. First, even if Sandia Labs is a d/b/a for Sandia Corporation, this does not necessarily end the inquiry. Although "[g]enerally, the designation 'd/b/a' or 'doing business as' is merely descriptive of the person or corporation doing business under some other name," there are instances where a d/b/a can be an independent legal entity. *General Ins. Co. of America v. Clark Mall, Corp.*, 631 F. Supp. 2d 968, 973 (N.D. Ill. 2009). Although the question whether Sandia Labs is generally a d/b/a for Sandia Corporation may have some import, the more critical question is whether in *this instance*, the assignment to Sandia Labs effectively operated to transfer ownership rights in '321 to Sandia Corporation.

Second, STC's citations to Sandia Corporation's prior court filings are largely unhelpful. In conducting its own search, the Court identified numerous inconsistencies in the way Sandia Corporation has identified itself in prior proceedings. In one case, for example, Sandia Corporation confirmed its use of the d/b/a in answering a Plaintiff's Complaint with "Sandia Corporation, Inc., d/b/a Sandia National Laboratories." *Bespalko, et al v. Sandia Corp., Inc. d/b/a Sandia Nat'l Labs*, *Lockheed Martin Corp., & AT&T*, 99cv1466 (Doc. 31). In another,

20

Sandia Corporation specifically disclaimed the use of a d/b/a. *Matic v. Sandia Corp. d/b/a Sandia National Labs*, 05cv0453 (Doc. 5 ¶ 3) ("Defendant admits the allegations contained therein except it denies that it is a 'd/b/a' and affirmatively states that it operates and manages Sandia National Laboratories until [sic] a contract with the U.S. Department of Energy.") Finally, STC's attachment of underlying patent documents in its surreply, while informative, does not establish '321's ownership as a matter of law.  In contrast to those patent documents, the 1996 assignment at issue identifies only Sandia National Laboratories as assignee.

There are, however, other factors supporting STC's position.  First, the 1996 assignment listing "Sandia National Laboratories" as assignee also states that Draper "is an employee of Assignee" and was employed by "Assignee" at the time he assigned his interest in SN/543 to UNM.   It is uncontested, however, that Draper was not employed by Sandia Labs; he was employed by Sandia Corporation.  Second, nothing the parties cite nor anything else the Court could identify conclusively establishes that Sandia Labs currently holds title to property, intellectual or otherwise.  The Court was unable to find any instances of Sandia Labs exercising its patent rights through infringement suits, did not see Sandia Labs on any list of federal agencies or sub-agencies, and repeatedly observed the labs referred to as "facilities" in the statutes cited by Intel.  Finally, it was Sandia Corporation – not Sandia Labs – that was party to the Commercialization Agreement with STC defining how these entities would work together to protect and commercialize the '321 patent.  (Doc. 188-6, Ex. 6 at 1).

Faced with this conflicting evidence, and without the presence of representatives from Sandia Corporation, Sandia National Laboratories (assuming its separate existence), or the Department of Energy attesting to the existence of an ownership interest in '321, the Court is

unable to determine that Sandia Labs owns an undivided interest in '321 as a matter of law. This question will therefore remain outstanding pending further development of the record. The parties are invited to submit further dispositive motions on the issue should evidence come to light conclusively establishing whether Sandia National Laboratories, as an independent legal entity, holds title to the '321 patent via the 1996 assignments.

D.    Standing

It is undisputed that STC's December 1, 2011 assignment of an undivided ownership interest in '998 to Sandia Corporation created joint ownership of that patent. Addition of a new co-owner at this point, however, raises the issue of proper standing. "Where one co-owner possesses an undivided part of the entire patent, that joint owner must join all the other co-owners to establish standing. . . . Absent the voluntary joinder of all co-owners of a patent, a co-owner acting alone will lack standing." *Israel Bio-Engineering Project v. Amgen, Inc.,* 475 F.3d 1256, 1264-65 (Fed. Cir. 2007) (quotations omitted). The parties are encouraged to confer with one another and to file appropriate motions with the Court addressing this issue within a reasonable period of time.

**THEREFORE, IT IS ORDERED** that Intel's Motion for Summary Judgment for Unenforceability and Memorandum in Support, filed January 19, 2012 (doc. 178), is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that United States Patent No. 6,042,998 is declared unenforceable prior to December 1, 2011.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**