UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

STC.UNM,

        Plaintiff,

vs.                                                  No. 10-CV-01077-RB-WDS

INTEL CORPORATION,

        Defendant.

**SANDIA CORPORATION'S RESPONSE TO STC.UNM'S RULE 19 MOTION TO CORRECT STANDING AND REQUEST FOR RECONSIDERATION**

      COMES NOW Sandia Corporation (Sandia), by and through its attorneys, Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A., and responds[1] to STC.UNM (STC)'s Rule 19 Motion to Correct Standing and Request for Reconsideration as follows:

**I.    INTRODUCTION**

      STC asserts in this action that Intel Corporation (Intel) has infringed patent rights it holds under United States Patent No. 6,042,998 ("the '998 patent"). On January 19, 2012, Intel filed a motion for summary judgment, in which it asserted that the '998 patent is unenforceable because the '998 patent and U.S. Patent No. 5,705,321 ("the '321 patent") are not commonly owned, as required by a terminal disclaimer filed by STC with the United States Patent and Trademark Office on May 18, 1999. This Court granted in part, and denied in part, Intel's Motion for Summary Judgment on May 8, 2012. Of significance to the instant Rule 19 Motion by STC, as part of its decision on Intel's Motion, the Court held that Sandia acquired joint ownership of the '998 patent through a December 1, 2011 assignment from STC. Because a co-owner lacks

---

[1] Sandia is not a party to this proceeding. And as detailed in this response, Sandia does not wish to become a party to this proceeding. Sandia does, however, have an interest in the outcome of STC's motion, and for that reason, submits this response. To the extent intervention is necessary, Sandia seeks to intervene in this matter for the limited purpose of opposing STC's Rule 19 Motion.

1

standing unless all co-owners join in an action, STC now asks the Court to join Sandia as an involuntary plaintiff under Federal Rule of Civil Procedure 19. In the alternative, STC asks the Court to proceed without Sandia, under Rule 19(b).

As STC recognizes in its Motion, Sandia prefers to take a neutral position with respect to this matter. Such neutrality cannot be maintained if Sandia is forced to become a plaintiff in this action. It is for this reason, and because Sandia is not subject to involuntary joinder, that Sandia has elected to affirmatively oppose STC's effort to join Sandia.

Sandia cannot be forced to join this matter as an involuntary plaintiff under Rule 19(a) because, as detailed below, co-owners of a patent cannot be forced to join infringement proceedings such as this one. Involuntary joinder is only appropriate in very narrow circumstances, which do not exist here. In particular, despite STC's efforts to argue otherwise, STC is not an exclusive licensee of the '998 patent. Accordingly, Sandia asks the Court to decline to involuntarily join Sandia under Rule 19(a).[2]

## II. SANDIA CANNOT BE INVOLUNTARILY JOINED IN THIS MATTER

The Court held in its May 8, 2012 decision that Sandia acquired an undivided ownership interest in the '998 patent as a result of STC's December 1, 2011 assignment. This created an issue of standing for STC. Specifically, "[w]here one co-owner possesses an undivided part of the entire patent, that joint owner must join all other co-owners to establish standing." *Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1264-65 (Fed. Cir. 2007); *see also*

---

[2] With respect to STC's 19(b) argument, Sandia would like to clarify that it is not, as argued by STC, a "quasi-governmental entity." *See* Motion at 3. Instead, Sandia is a private corporation that manages and operates Sandia National Laboratories under contract no. DE-AC04-94AL85000 with the United States Department of Energy as a Federally Funded Research and Development Center (FFRDC) in accordance with United States Code of Federal Regulations Title 48, Part 35, Section 35.017.

*Ethicon Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1467 (Fed. Cir. 1998) ("An action for infringement must join as plaintiffs all co-owners.").

"Ordinarily, one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit." *Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 345 (Fed. Cir. 1997); *see also Ethicon*, 135 F.3d at 1468 ("as a matter of substantive patent law, all co-owners must ordinarily consent to join as plaintiffs in an infringement suit"). As recognized by the Court in *Ethicon*, this principle is consistent with § 262 of the Patent Act, which provides that "[i]n the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners." *See Ethicon*, 135 F.3d at 1468; 35 U.S.C. § 262. Moreover, the Federal Circuit has "explicitly held that Rule 19 does not permit the involuntary joinder of a patent co-owner in an infringement suit brought by another co-owner." *DDB Techs., L.L.C. v. MLD Advanced Media, L.P.*, 517 F.3d 1284, 1289 n.2 (Fed. Cir. 2008).

STC acknowledges in its Motion that Rule 19(a) cannot be used to involuntarily join a patent owner, but relies on an exception to the general rule relating to exclusive licensees. *See* Motion at 2. "[W]hen any patent owner has granted an exclusive license, he stands in a relationship of trust to his licensee." *Ethicon*, 135 F.3d at 1467 n. 9. For this reason "an exclusive licensee may join the patent owner as an involuntary plaintiff in an infringement suit." *DDB Techs.*, 517 F.3d at 1289 n.2; *see also Ethicon*, 135 F.3d at 1467 n. 9.

In an effort to fit within this exception, STC asserts that a 2009 Commercialization Agreement makes STC the exclusive licensee of the '998 patent. *See* Motion at 3-4. Sandia notes as an initial matter that the Court held in its recent decision on Intel's motion for summary

3

judgment that Sandia did not acquire an interest in the '998 patent until STC's recent December, 2011 assignment. *See* MOO, Doc. No. 206, at 22. STC's suggestion that Sandia had an interest prior to December, 2011 capable of supporting the grant of an exclusive license is inconsistent with the Court's decision concerning ownership of the '998 patent. Sandia could not have granted an exclusive license in the '998 patent to STC, when Sandia lacked an interest in the '998 patent. *See* Ballentine's Law Dictionary, Definition of "exclusive license" ("A grant by the proprietor of a patent to another person of the right to make, use, or sell the patented article, including the condition that the grantor will grant no further license of the kind in respect of such article to any other person.")

In any event, STC's arguments concerning the Commercialization Agreement rest on an unwarranted extension of the scope of the Commercialization Agreement, and a strained interpretation of the Agreement's language. In June 2009, STC, UNM, and Sandia entered into the Commercialization Agreement on which STC now relies. The agreement defines the "Intellectual Property" to which it relates as:

> Technology was disclosed to STC on September 20, 1993 in SD-5308 (Sandia)/UNM-322 (STC)
> U.S. Issued Patent No. 5,705,321 issued on January 6, 1998
> Title: *"Method for Manufacture of Quantum Sized Periodic Structures in Si Materials"*
> Inventors: Steven R.J. Brueck, Saleem H. Zaidi, An-Shyang Chu, and Bruce Draper

Commercialization Agreement, Intellectual Property, ¶ 1.

STC argues that that the term "Intellectual Property" "was intended to act as [a] catch-all that sweeps all patents originating from the 'technology' [disclosed in UNM-322/SD-5308], including the '998." Motion at 4. But this argument simply cannot be reconciled with the plain language of the Commercialization Agreement.

First, in contrast to the express reference to the '321 patent, no mention is made of the '998 patent. And this Court has already recognized that the Commercialization Agreement relates only to the '321 patent. *See id.* at 5 (STC and Sandia "did not enter into any Commercialization Agreement regarding '998, however, as STC considered itself the owner of a 100% interest in that patent").

The Commercialization Agreement further reflects its application to only the '321 patent by identifying Bruce Draper as one of the inventors of the Intellectual Property. *See* Commercialization Agreement, Background, ¶ 1. Notably, Mr. Draper was an inventor of the '321 patent, but not the '998 patent. *See* MOO, Doc. No. 206 at 11 ("It is undisputed that Draper did not co-invent any claims of the '998 patent."); *id.* at 3 (Draper was named as co-inventor of the '321 patent).

STC argues that, by listing the employment of the inventors separately in the "Background" heading of the Commercialization Agreement, "STC and Sandia understood that the Intellectual Property covered by the Commercialization Agreement was a combination of intellectual property each considered to be entirely their own." Motion at 6. However, the intent of that separate listing was plainly not to expand the Agreement's coverage to all patents originating from the inventions created by all four inventors, whether made individually, or together, but simply to provide a basis for the pro-rata distribution of the Licensing Income to the respective employers. *See* Commercialization Agreement, Division of Commercialization Proceeds, ¶ 3, and Exhibit A, Worksheet to Calculate Division of Commercialization Proceeds.

Moreover, even if the Commercialization Agreement could be expansively interpreted as encompassing the '998 patent, it falls far short of granting STC the exclusive license that would be required to involuntarily join Sandia. *See Ethicon*, 135 F.3d at 1467 n. 9. The Agreement

5

provides that "The PARTIES agree that STC, as PATENTING LEAD, shall undertake all patenting and prosecution or other protection of the INTELLECTUAL PROPERTY." Commercialization Agreement, Responsible Party, ¶ 1. STC argues, without citation to any authority, that the term "protection" included in the agreement, "includes, among other things, obtaining rights as well as preventing the loss of rights." *See* Response at 5. But even acceptance of this unsupported definition cannot bridge the gap to the conclusion that STC was granted an exclusive license.

The Commercialization Agreement, at most, makes STC an exclusive licensing agent of the '321 patent—which is entirely distinct from an exclusive licensee. A license is a grant of rights from a patent owner to a non-owner, under which the patent-owner agrees not to sue the non-owner for infringement. *See Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH, v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987) ("a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee"); *see also, e.g. Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995). There would have been no need for Sandia to grant an exclusive license to STC through the Commercialization Agreement because Sandia and STC jointly own the '321 patent, and again, Sandia could not have granted STC an exclusive license to the '998 patent because it lacked an interest in the '998 patent at the time the Commercialization Agreement was executed.

What the Commercialization Agreement in fact does is put STC in charge of licensing to any third parties. It provides:

> SANDIA agrees to refrain from licensing the INTELLECTUAL PROPERTY. SANDIA shall refer all inquiries regarding licensing for the INTELLECTUAL PROPERTY to STC and this party shall be referred to as the LICENSING PARTY.

Consistent with this plain language, the 1994 letter on which STC relies indicates that STC will be made "the exclusive licensing agent"—not an exclusive licensee, as STC represents. *See* Exhibit D to Motion; Motion at 6.

Also reflecting STC's role as licensing agent is the provision of the Commercialization Agreement allowing costs incurred by STC in its roles as Patenting Lead and Licensing Party to be deducted from the Licensing Income to be shared by the parties under the terms of the Agreement. Under the heading "Division of Commercialization Proceeds", the Commercialization Agreement provides:

> The PARTIES agree to reimburse the PATENTING LEAD, from LICENSING INCOME, patent costs of $20,000 as set out in the MOU for patent preparation and prosecution, plus all out-of-pocket fees paid to the USPTO. Such out-of-pocket fees paid to the USPTO shall be evidenced by actual invoices for the filing and prosecution of any patent applications and the issuance and maintenance of any patents protecting the INTELLECTUAL PROPERTY and shall not exceed $25,000 per U.S. patent.

Commercialization Agreement, Division of Commercialization Proceeds, ¶ 2. STC argues that "if the CA were limited to the '321 patent, there would be no need to include these forward-looking terms in the CA." Motion at 5. But that interpretation is not supported by the terms of the Agreement, or the context in which the Agreement was executed.

Even if the terms were interpreted to be forward-looking, this provision could not reflect an intent to extend the Commercialization Agreement to the '998 patent because the '998 patent issued on March 28, 2000 and the United States Patent and Trademark Office granted STC's petition to make the '998 patent a continuation-in-part of the '321 patent on December 30, 2008, long before the Commercialization Agreement was signed on June 30, 2009. *See* MOO, Doc. No. 206 (May 8, 2012), at 5 ('998 patent issued on March 28, 2000).

Furthermore, when this provision is considered along with the other paragraphs under the heading "Division of Commercialization Proceeds," it is clear that the parties' intent was merely to ensure that STC would be able to deduct expenses incurred in its role as Patenting Lead and Licensing Party from licensing proceeds to be shared with Sandia. In that regard, Sandia notes that paragraph 1 under the same heading defines "LICENSING INCOME" as "all consideration received by either party in any form from transferring rights in the INTELLECTUAL PROPERTY," and paragraph 3 under the same heading details how the "LICENSING INCOME" is to be shared between STC and Sandia. *See* Commercialization Agreement, Division of Commercialization Proceeds, ¶¶ 1, 3. Therefore, these terms were needed because, at the time the Commercialization Agreement was executed on June 30, 2009, the '321 patent had apparently not yet been licensed to third parties by STC. STC did not make any payment to Sandia for licensing of the '321 patent until December 3, 2009, when Sandia received a check payment of $2,076.20 for licensing by STC of the '321 patent to Toshiba Corporation. *See* SNL00000250-252, attached hereto as Exhibit A. Thus, paragraph 2 under "Division of Commercialization Proceeds" not only cannot be interpreted as reflecting an intent to extend the scope of the Commercialization Agreement, but also demonstrates that STC was merely made a licensing agent—not an exclusive licensee.

In sum, the 2009 Commercialization Agreement related to the '321 patent cannot plausibly be interpreted as making STC an exclusive licensee of the '998 patent. The Agreement not only fails to mention the '998 patent, but also expressly relates only to the '321 patent. And even if the Agreement could somehow be interpreted as extending to the '998 patent, under the Court's previous ruling, Sandia lacked an ownership interest in the '998 patent at the time the Commercialization Agreement was signed, giving it no basis on which to make STC an

8

exclusive licensee. Furthermore, the Commercialization Agreement does not grant an exclusive license, but rather, merely puts STC in charge of licensing the intellectual property to third parties. STC has consequently failed to fall within the exclusive-licensee exception to the rule precluding involuntary joinder of co-owners of a patent. The Court must therefore decline to join Sandia under Rule 19(a).

### III. MR. BIEG'S DECLARATION DOES NOT CONCERN THE '998 PATENT.

Finally, STC asserts that "[t]he Court should reconsider its decision that Sandia has not been the owner of the '998 patent since at least . . . December, 2008, if not earlier, as a result of the new evidence contained in the June 6, 2012 Declaration of Kevin Bieg." Motion at 9. STC relies in particular on Mr. Bieg's reference to the Atomic Energy Act, 42 U.S.C. § 5908.

Sandia takes no position on whether the Court should reconsider its May 8, 2012 Memorandum Opinion and Order. Sandia nonetheless notes that Mr. Bieg's declaration simply clarifies ownership of the '321 patent. As detailed in Mr. Bieg's declaration, under the Atomic Energy Act, the United States automatically acquired title to the '321 patent by virtue of Sandia's contract with the Department of Energy, and Mr. Draper's employment contract with Sandia. Bieg Declaration, Exhibit B to Motion, ¶ 8. The Department of Energy subsequently allowed Sandia to retain title to the '321 patent. *See id.* In contrast, as recognized by the Court in its May 8, 2012 decision, Mr. Draper was not an inventor of the '998 patent. *See* MOO, Doc. No. 206 (May 8, 2012). Thus, the United States did not acquire an interest in the '998 patent through Sandia or Mr. Draper under the Atomic Energy Act's automatic-vesting provision. *See* 42 U.S.C. § 5908(a) (automatic vesting provision applies when an "invention is made or conceived in the course of or under any contract of the Department" and the inventor has an employment

connection to that contract). Mr. Bieg's declaration was therefore not intended to have any bearing on the issue of ownership of the '998 patent.

## IV.  CONCLUSION

Although all co-owners of a patent are considered to be necessary parties to an infringement action, their joinder must be voluntary. A co-owner like Sandia cannot be forced under Rule 19(a) to participate as a plaintiff in an infringement action. And while there are limited exceptions to the rule requiring voluntary joinder, STC has failed to establish an exception applies. Sandia did not, contrary to STC's contentions, make STC an exclusive licensee of the '998 patent. STC consequently cannot compel Sandia to become a party to this matter.

Dated: July 3, 2012
                              Respectfully submitted,

                              STELZNER, WINTER, WARBURTON,
                              FLORES, SANCHEZ & DAWES, P.A.

                              */s/ Luis G. Stelzner*
                              Luis G. Stelzner
                              Jaime L. Dawes
                              P.O. Box 528
                              Albuquerque, NM 87103
                              (505) 938-7770
                              *Attorneys for Sandia Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 3, 2012, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to all counsel who have entered an appearance in this action.

*/s/ Luis G. Stelzner*
Luis G. Stelzner

S:\TXTLIB\11044\Pleadings\response to rule 19 motion final 07-03-12.docx