# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

STC.UNM,

                    Plaintiff,

          v.

INTEL CORPORATION,

                    Defendant.

Civil No. 1:10–cv–01077–RB–WDS

---

**INTEL'S OPPOSITION TO STC'S RULE 19 MOTION AND REQUEST FOR RECONSIDERATION OF THE COURT'S SUMMARY JUDGMENT RULING**

Clifford K. Atkinson
Douglas A. Baker
ATKINSON, THAL & BAKER, P.C.
201 Third Street, N.W., Suite 1850
Albuquerque, NM 87102
(505) 764–8111

Robert A. Van Nest
Brian L. Ferrall
Benedict Y. Hur
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391–5400

Chad. S. Campbell
Timothy J. Franks
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012
(602) 351–8000

# Table of Contents

Table of Authorities ..................................................................................................... ii

Introduction ............................................................................................................... 1

Background ................................................................................................................ 2

Argument .................................................................................................................. 4

    I.    STC Cannot Involuntarily Join Sandia Under Rule 19(a) ...........................4

        A.    Patent Law Generally Requires Voluntary Joinder of All Patent Co-Owners ...................................................................................... 5

        B.    STC Cannot Compel Sandia to Join Because STC Is Not the Exclusive Licensee of the '998 Patent .............................................. 5

            1.    The June 22, 2009, Commercialization Agreement Between STC and Sandia Does Not Cover the '998 Patent ....................6

            2.    Even If the Commercialization Agreement Extended to the '998 Patent, It Did Not Make STC the Exclusive Licensee of Sandia.............14

    II.    Equity Does Not Allow STC to Invoke Rule 19(b) and Treat Sandia, Which STC Itself Brought into This Dispute, as a Dispensable Party ...........................17

    III.    STC's Motion to Reconsider the Court's Summary Judgment Ruling Is Procedurally Improper and Substantively Meritless...................................22

        A.    STC's New Legal Argument Improperly Relies on Evidence that Was Available Before Summary Judgment Was Sought or Granted ...................... 22

        B.    Federal Retention-of-Title Rules Are Irrelevant Because No Sandia Employee Was an Inventor of the '998 Patent .................................. 23

Conclusion ................................................................................................................ 24

Certificate of Service ............................................................................................... 26

## Table of Authorities

**Cases**                                                                                                                                    **Pages**

*A10 Networks, Inc. v. Brocade Commc'ns Sys., Inc.,*
    No. 5:11–CV–05493–LHK, 2012 WL 1932878 (May 29, 2012) ....................................18

*A123 Sys., Inc. v. Hydro-Quebec,*
    626 F.3d 1213 (Fed. Cir. 2010) ........................................................................................18

*Abbott Labs. v. Diamedix Corp.,*
    47 F.3d 1128 (Fed. Cir. 1995) ..........................................................................................14

*Bushnell, Inc. v. Brunton Co.,*
    659 F. Supp. 2d 1150 (D. Kan. 2009) ..............................................................................18

*Dainippon Screen Mfg. Co. v. CFMT, Inc.,*
    142 F.3d 1266 (Fed. Cir. 1998) ........................................................................................18

*DDB Techs., L.L.C. v. MLB Advanced Media,*
    517 F.3d 1284 (Fed. Cir. 2008) ..........................................................................................5

*Dow Chem. Co. v. Exxon Corp.,*
    139 F.3d 1470 (Fed. Cir. 1998) ........................................................................................18

*Ethicon, Inc. v. U.S. Surgical Corp.,*
    135 F.3d 1456 (Fed. Cir. 1998) ....................................................................................5, 16

*Fallaux, In re,*
    564 F.3d 1313 (Fed. Cir. 2009) ........................................................................................20

*Indep. Wireless Tel. Co. v. Radio Corp. of Am.,*
    269 U.S. 459 (1926) ..................................................................................5, 14, 15, 16, 17

*Israel Bio-Eng'g Project v. Amgen, Inc.,*
    475 F.3d 1256 (Fed. Cir. 2007) ..............................................................................4, 5, 17

*J.M. v. N.M. Dep't of Health,*
    No. Civ. 07–0604 RB/ACT (Mar. 5, 2009) ....................................................................22

*Moore v. Marsh,*
    74 U.S. 515 (1868) ............................................................................................................17

*Republic of Philippines v. Pimentel,*
    553 U.S. 851 (2008) ..........................................................................................................20

**Cases (continued)**                                                                                    **Pages**

*Rite-Hite Corp. v. Kelley Co.,*
    56 F.3d 1538 (Fed. Cir. 1995) (en banc) .......................................................................15

*Servants of Paraclete v. Does,*
    204 F.3d 1005 (10th Cir. 2000) ...................................................................................22

*Willingham v. Lawton,*
    555 F.2d 1340 (6th Cir. 1977) ......................................................................................6

**Statutes and Rules**

35 U.S.C. § 41(b) ...........................................................................................................11

35 U.S.C. § 251 ...............................................................................................................11

35 U.S.C. § 254 ...............................................................................................................11

35 U.S.C. § 255 ...............................................................................................................11

35 U.S.C. § 256 ...............................................................................................................11

35 U.S.C. § 261 ...............................................................................................................16

42 U.S.C. § 5908 .............................................................................................................23

Fed. R. Civ. P. 19 ...................................................................................................... 1, *passim*

Fed. R. Civ. P. 19 committee note on 1937 adoption ...................................................14

Fed. R. Civ. P. 19(a) .................................................................................................. 1, *passim*

Fed. R. Civ. P. 19(b) .................................................................................................. 1, *passim*

**Introduction**

STC's Rule 19 motion concedes that STC has lacked standing to pursue its patent claims against Intel since last December and that to proceed it must defy a basic principle of patent law: that all co-owners of a patent need to join an infringement suit against another party. STC put itself in this bind. STC had standing as sole owner of the '998 patent when it filed suit, but the patent was unenforceable under its terminal disclaimer because the '321 patent had different ownership. Desperate to create common ownership and salvage the remaining term of the '998 patent before it expires in September, STC unilaterally assigned partial ownership in the '998 patent to Sandia Corporation ("Sandia"). But STC did so at the cost of its standing to sue, and, as Sandia's opposition to STC's motion confirms, Sandia wants no part of this dispute.

STC thus asks the Court to take one of two steps to enable STC to proceed without voluntary joinder by its co-owner. Both steps are unprecedented and unwarranted. First, STC asks the Court to involuntarily join Sandia as a co-plaintiff under Rule 19(a) on the theory that STC is Sandia's "exclusive licensee" under the terms of a Commercialization Agreement signed nearly 2½ years before Sandia became a co-owner. That argument is doubly wrong: (1) as this Court has already recognized, the Commercialization Agreement was limited to the jointly-invented '321 patent, and (2) STC is not Sandia's exclusive licensee in any event. Second, STC claims that equity requires the Court to treat Sandia as a dispensable party under Rule 19(b) so that STC can proceed alone. But equity requires the opposite result. To begin with, Sandia's co-ownership is critical to STC's claim: STC survived summary judgment only because of it. Moreover, allowing STC to proceed alone would be prejudicial to both Intel and Sandia, and STC still has an alternate route by which it can regain standing and avoid unenforceability.

STC's motion also seeks reconsideration of the Court's summary judgment ruling, but that request should be denied for two reasons. First, STC's motion is improper because the supposedly "new" evidence it cites (information from Sandia lawyer Kevin Bieg about events in the 1990s) was available during the summary judgment briefing. STC attended Mr. Bieg's deposition last year and could have obtained testimony or a declaration on these topics then. Second, STC's latest co-ownership theory still fails because there was no Sandia co-inventor on the '998 patent. STC argues that the Department of Energy (DOE) automatically took title to the '998 patent under the Atomic Energy Act and then awarded title to Sandia and UNM jointly. But the statutory title-allocation provisions apply only to inventions by federal contractors. STC concedes, and the Court has found, that Sandia's Bruce Draper was *not* a co-inventor of the '998 patent. As a result, DOE—like Mr. Draper—had no rights in the '998 patent and could not and did not assign such rights to Sandia. As a matter of law, Sandia had no interest in the '998 patent before December 2011, when it received the unsolicited assignment from STC.

In short, the Court correctly granted summary judgment that the '998 patent was unenforceable before December 1, 2011, and STC lacks standing to sue for infringement since then without voluntary joinder by Sandia. Because Sandia has made clear that it will not join voluntarily, Intel has filed a cross-motion to dismiss STC's remaining claims and end this case.

## Background

The PTO allowed the '998 patent subject to a terminal disclaimer stipulating that the patent would be enforceable only while it and the '321 patent were commonly owned. [*See* Doc. 179–5] Sandia National Laboratories has co-owned the '321 patent ever since that patent issued because Bruce Draper was a co-inventor along with three UNM employees. It is uncontested,

however, that Mr. Draper did not co-invent the '998 patent. Instead, all four co-inventors of the '998 patent were UNM employees. As a result, UNM solely owned the '998 patent once it issued, and STC (UNM's wholly-owned licensing arm) succeeded to UNM's 100% ownership interest in 2007. Despite the lack of common ownership and resulting unenforceability, STC sued to enforce the '998 patent against numerous companies, including Intel.

When discovery last fall confirmed the continuing lack of common ownership, Intel promptly raised unenforceability as a defense. In response, STC took two tacks. First, despite having repeatedly asserted sole ownership to the PTO, ITC, courts, and alleged infringers, STC suddenly reversed course and claimed that Sandia had always co-owned the '998 patent. Second, recognizing the untenability of that position, STC unilaterally assigned a share of the '998 patent to Sandia on December 1, 2011, in an effort to salvage the remaining 10 months of the patent's term. [Doc. 179–31] STC did not secure Sandia's agreement to join as a plaintiff in this lawsuit before the assignment, however, and since then Sandia has maintained a neutral stance and refused to join STC's claim. Although STC could resolve both its standing and enforceability problems by acquiring sole ownership of both the '998 and '321 patents, STC has not done so.

Earlier this year, Intel moved for summary judgment of unenforceability of the '998 patent. In its summary judgment ruling [Doc. 206], this Court held as a matter of law that Sandia did not co-own the '998 patent before December 1, 2011, that the '321 and '998 patents thus lacked common ownership before that date, and that the '998 patent was therefore unenforceable before that date. Based on the existing record, however, the Court could not tell whether Sandia National Laboratories (the long-time co-owner of the '321 patent) and Sandia Corporation (the new co-owner of the '998 patent) were the same entity, and thus could not yet determine the

– 3 –

enforceability of the '998 patent from December 1, 2011, forward.[1]

At the end of its decision, the Court recognized that Sandia's current co-ownership of the '998 patent raised a standing problem for STC because Sandia is not a plaintiff in this case and as a general rule, "'[a]bsent the voluntary joinder of all co-owners of a patent, a co-owner acting alone will lack standing.'" [*Id.* at 22 (quoting *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1264–65 (Fed. Cir. 2007))] The Court encouraged the parties to confer and file appropriate motions regarding standing [*id.*], and later ordered the parties to report on the status of the standing issue by June 1, 2012 [Doc. 212]. STC reported on that date that it had been unable to reach any agreement with Sandia and that it planned to file its current motion requesting relief allowing it to proceed with this case despite Sandia's refusal to join voluntarily.

To fix its standing problem, STC asks the Court either to join Sandia as an involuntary plaintiff under Rule 19(a) or to ignore Sandia's absence by deeming it a necessary-but-dispensable party under Rule 19(b). Trying to relitigate summary judgment, STC further urges the Court to adopt a new (third) theory that Sandia has always co-owned the '998 patent on the ground that the Department of Energy (DOE) implicitly granted both UNM and Sandia title to the '998 patent when awarding them title to the '321 patent. As explained below, each of STC's arguments is wrong, and the time is ripe for the Court to put this case to an end.

## Argument

## I.  STC CANNOT INVOLUNTARILY JOIN SANDIA UNDER RULE 19(a)

Patent law normally requires voluntary joinder of all co-owners in order to sue a third

---

[1] Enforceability after December 1, 2011, remains an open issue, but for purposes of this motion Intel will assume (without conceding) that the two Sandia entities are the same. Neither STC's motion nor Intel's cross-motion to dismiss requires resolution of that point.

party for infringement. STC purports to invoke a narrow exception allowing a patent owner's *exclusive licensee* to join the owner as a co-plaintiff against its will, but that exception does not apply because STC is a *co-owner* of the '998 patent, not Sandia's *exclusive licensee*.

### A.    Patent Law Generally Requires Voluntary Joinder of All Patent Co-Owners

The Federal Circuit has repeatedly recognized that "as a matter of substantive patent law, all co-owners must ordinarily consent to join as plaintiffs in an infringement suit" and that "'one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit.'" *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998); *see also Israel Bio-Engineering*, 475 F.3d at 1264 (each co-owner of a patent "'has the right to limit the other co-owner's ability to sue infringers by refusing to join voluntarily in [a] patent infringement suit'"). Because one co-owner can unilaterally prevent another co-owner from suing, "patent co-owners are 'at the mercy of each other.'" *Ethicon*, 135 F.3d at 1468.

The Federal Circuit recently reaffirmed this principle in *DDB Technologies, L.L.C. v. MLB Advanced Media*, 517 F.3d 1284 (Fed. Cir. 2008), holding that, in general, "Rule 19 does not permit the involuntary joinder of a patent co-owner in an infringement suit brought by another co-owner." *Id.* at 1289 n.2.

### B.    STC Cannot Compel Sandia to Join Because STC Is Not the Exclusive Licensee of the '998 Patent

The Federal Circuit has recognized only two narrow situations in which an owner may be forced to join a suit involuntarily. *Ethicon*, 135 F.3d at 1468 n.9. First, an owner can be forced to join when it has granted the plaintiff an exclusive license, because equity forbids a licensor-owner from nullifying that exclusivity by refusing to join the licensee's infringement suit. *Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 469 (1926). Second, an owner can be

– 5 –

forced to join a suit if the owner has contractually waived its right to refuse to join. *Willingham v. Lawton*, 555 F.2d 1340, 1344–45 (6th Cir. 1977). STC concedes that Sandia never waived its right to refuse to join this suit, so it strains to invoke the exception for exclusive licensees.

In particular, STC contends that Sandia, through a Commercialization Agreement dated June 22, 2009, made STC the exclusive licensee of the '998 patent. That argument fails because (1) as this Court pointed out in its summary judgment order, the Commercialization Agreement applies only to the '321 patent, not to the '998 patent; and (2) the Commercialization Agreement does not make STC the *exclusive licensee* of any patent. Notably, Sandia's opposition to STC's motion fully concurs with this view of the contract, to which Sandia is a party. [Doc. 224 at 3–9]

### 1.   The June 22, 2009, Commercialization Agreement Between STC and Sandia Does Not Cover the '998 Patent

In its summary judgment order, this Court recognized that STC and Sandia "did not enter into any Commercialization Agreement regarding [the] '998 [patent] … as STC considered itself the owner of a 100% interest in that patent." [Doc. 206 at 5] STC ignores that finding. But even if the issue were open for reconsideration, the Commercialization Agreement was plainly limited to the '321 patent, which was jointly invented by UNM and Sandia employees and jointly owned by STC and Sandia. It did not cover the '998 patent, which was a UNM-only invention that Sandia now co-owns only as a result of STC's litigation-inspired gift more than two years later.[2]

The origins of the Commercialization Agreement make clear that it was not designed to apply to inventions made solely by UNM employees, such as the '998 patent. By its terms, the

---

[2] The only variant of STC's argument not already considered in connection with the summary judgment motion is STC's paradoxical notion that its December 1, 2011, assignment to Sandia somehow converted the June 22, 2009, Commercialization Agreement into a contract that covers the '998 patent as well. As discussed below, that argument makes no sense.

Commercialization Agreement was adopted pursuant to a 2006 Sandia–STC–UNM

Memorandum of Understanding on Intellectual Property ("MOU"). [*See* Doc. 218–6

(Commercialization Agreement) preamble] The scope of the MOU was expressly limited to

intellectual property jointly developed and therefore jointly owned by Sandia and UNM/STC.

The MOU "set[ ] forth certain understandings … regarding patenting, licensing, and royalty

sharing of certain inventions and works of authorship that are jointly owned by Sandia and

UNM." [Doc. 218–5 preamble] It specifically defined "Jointly-Owned Intellectual Property" as

"Intellectual Property that arises from a Subject Invention." [*Id.* ¶ 1(g)] "Subject Invention," in

turn, was defined as any invention "created, conceived or first actually reduced to practice"

according to an arrangement described in § 2 of the MOU. [*Id.* ¶ 1(a)] Section 2 listed "Subject

Inventions *created by both Sandia agents and UNM agents*" and "Subject Inventions *created by*

*individuals who are Joint Appointees*" (meaning "employed and paid part-time by Sandia and

part-time by UNM"). [*Id.* ¶ 2 (emphasis added); *see id.* ¶ 1(d) (defining "Joint Appointee")]

        The text of the Commercialization Agreement further confirms that it covered the '321

patent jointly invented by Sandia's Bruce Draper, and not the '998 patent on which only UNM

employees were inventors. The Commercialization Agreement's Background section made clear

that the INTELLECTUAL PROPERTY covered was intellectual property to which Draper and

Sandia contributed. It recited that

            One inventor (Draper) was an employee of SANDIA at the time of
            development of the INTELLECTUAL PROPERTY whose
            contributions to the INTELLECTUAL PROPERTY is considered
            to be entirely SANDIA

[Doc. 218–6 Background ¶ 1] and that

> Three inventors (Brueck, Zaidi and Chu) were employees of UNM
> at the time of development of the INTELLECTUAL PROPERTY
> whose contributions to the INTELLECTUAL PROPERTY are
> considered to be entirely STC

[*Id.* Background ¶ 2] The list of inventors (Draper, Brueck, Zaidi, and Chu) matched the

inventorship of the '321 patent exactly. [*See* Doc. 179–24] By contrast, the list of inventors of

the '998 patent was very different: it included UNM employees Hersee and Malloy in addition to

Brueck and Zaidi, but excluded both Chu and Draper. [*See* Docs. 179–10, 179–11]

The Background of the Commercialization Agreement went on to note that

> The U.S. Government has Government Use Rights in all works of
> authorship created and inventions conceived or first actually
> reduced to practice by SANDIA and SANDIA employees. The
> Parties agree to ensure that all interested parties are availed [of] the
> Government[']s Use Rights for such intellectual properties on
> contracts from the Government.

[Doc. 218–6 Background ¶ 3] That discussion of government use rights applies to the '321

patent, to which Sandia employee Draper contributed, but it does not apply to the '998 patent,

which no Sandia employee co-invented.

Furthermore, when the Commercialization Agreement defined the INTELLECTUAL

PROPERTY it covered, it recited the '321 patent but not the '998 patent:

> Technology was disclosed to STC on September 20, 1993 in
> SD–5308 (Sandia)/UNM–322 (STC)
> U.S. Issued Patent No. 5,705,321 issued on January 6, 1998
> Title: "*Method for Manufacture of Quantum Sized Periodic
> Structures in Si Materials*"
> Inventors: Steven R.J. Brueck, Saleem H. Zaidi, An-Shyang Chu,
> and Bruce L. Draper.

[*Id.* Intellectual Property ¶ 1] This bibliographic description matches the '321 patent perfectly,

and it does *not* fit the '998 patent. The inventions claimed in the '998 patent were *not* disclosed

by Sandia to STC in September 1993. The '998 patent is *not* the '321 patent issued in 1998. The '998 patent has a different title ("Method and Apparatus for Extending Spatial Frequencies in Photolithography Images"). And neither Chu nor Draper co-invented the '998 patent.

Exhibit A to the Commercialization Agreement further confirms that the Agreement is limited to the '321 patent. Exhibit A allocates 90% of the commercialization proceeds according to the number of inventors that each party provided. Consistent with the '321 patent, Exhibit A says there were three UNM inventors and one Sandia inventor, entitling STC to 77.5% and Sandia to 22.5% of revenues. [Doc. 218–6 Ex. A] Such an allocation of revenues would be inappropriate for the '998 patent, which has no Sandia inventors, or for a combination of the '321 and '998 patents, which have, in total, one Sandia inventor and five UNM inventors.[3]

Sandia is thus entirely correct that "STC's arguments concerning the Commercialization Agreement rest on an unwarranted extension of the scope of the Commercialization Agreement, and a strained interpretation of the Agreement's language." [Doc. 224 at 4] Indeed, it is nonsensical to think STC and Sandia meant the Commercialization Agreement to cover the '998 patent. No Sandia employee was a co-inventor, and Sandia had no ownership interest in the '998 patent until over two years later, when STC gave Sandia an interest in a belated effort to render the '998 patent enforceable. Notably, the Commercialization Agreement was dated *after* the December 2008 Certificate of Correction in which the PTO, at STC's behest, designated the '998 patent a continuation-in-part of the '321 patent. [*See* Doc. 179–13 (Certificate of Correction)] If STC and Sandia had meant the Commercialization Agreement to cover the '998 patent as well as the '321 patent (as a result of the Certificate of Correction or otherwise), they would have said

---

[3] Consistent with this, STC's discovery responses throughout this case have identified no evidence that STC has shared any '998-patent-related revenue with Sandia.

– 9 –

so. And if STC and Sandia had intended the December 2011 assignment to expand the

Commercialization Agreement and encumber Sandia's new interest in the '998 patent, they

would have agreed to amend the Commercialization Agreement to reflect that. They did not.

STC's contrary arguments cannot withstand scrutiny.

### The Referenced Docket Numbers Do Not Include the '998 Patent.

STC first argues (at 4) that the Commercialization Agreement could not have been

limited to the '321 patent because the definition of "Intellectual Property" also mentioned

"UNM–322/SD–5308." But UNM–322 and SD–5308 were merely the docket numbers that

UNM and Sandia assigned for the jointly-developed invention that became the '321 patent. [*See*

Ferrall Decl. Ex. 1 (1993 patent disclosure); Doc. 218–1] UNM has a *different* docket number,

UNM–482, for the solely-UNM invention that became the '998 patent [*see* Doc. 179–8], and that

number appears nowhere in the Commercialization Agreement. (Sandia has no docket number

for the '998 patent because no Sandia employee was an inventor.) STC suggests that the parties

must have meant the docket numbers to cover more than just the '321 patent because otherwise

the docket information would be duplicative. But the Commercialization Agreement followed

the form specified in Exhibit A to the MOU, which directed the parties to describe "JOINTLY-

OWNED INTELLECTUAL PROPERTY" by technology disclosure date, title, inventors, *and*

patents/patent applications. [*See* Doc. 218–5 at 10 of 14] Moreover, the MOU made clear that

commercialization agreements were limited to jointly owned, jointly invented property. The '998

patent was not jointly invented, and it was not jointly owned by Sandia until December 1, 2011.

### Defined "INTELLECTUAL PROPERTY" Was Limited to the '321 Patent.

STC's observation (at 4) that the Commercialization Agreement uses the term

"INTELLECTUAL PROPERTY" also misses the mark. The Agreement defined the covered INTELLECTUAL PROPERTY as the '321 patent invented by Brueck, Zaidi, and Chu of UNM and Draper of Sandia, and it recited those inventors' contributions to the INTELLECTUAL PROPERTY in the Background section. Draper and Chu did co-invent the '321 patent, but they did *not* co-invent the '998 patent. UNM's Hersee and Malloy co-invented the '998 patent, but they were nowhere mentioned in the Commercialization Agreement. Contrary to STC's suggestion, the covered INTELLECTUAL PROPERTY was not anything remotely *related* to the '321 patent; it was the '321 patent itself. [*See also* Doc. 224 (Sandia Opp.) at 5 (agreeing)]

### STC's "PATENTING LEAD" Responsibilities Are Irrelevant.

STC's arguments (at 5–6) regarding STC's responsibilities as "PATENTING LEAD" also fail to suggest any extension to the '998 patent. STC contends it would make no sense to limit the INTELLECTUAL PROPERTY to the '321 patent because STC and Sandia agreed that STC would be responsible prospectively for patenting, prosecution, or other protection of the INTELLECTUAL PROPERTY. To begin with, this too was form language taken from the 2006 MOU, which was limited to jointly-developed, jointly-owned intellectual property. [*Compare* Doc. 218–6 Responsible Party ¶ 1 *with* Doc. 218–5 at 10 of 14] Further, the fact that a patent has already issued does not eliminate the need to take actions to protect the invention. For example, patentees must pay periodic maintenance fees to keep a patent in force, *see* 35 U.S.C. § 41(b), and they may need to seek reissue of a "defective" patent, *see* 35 U.S.C. § 251, petition to correct mistakes, *see* 35 U.S.C. § 254, 255, petition to correct named inventors, *see* 35 U.S.C. § 256, and so forth. Patentees may also need to take actions before foreign patent offices. Sandia and STC agreed to allocate such responsibilities to STC as to the '321 patent (and reimburse STC from

licensing proceeds), but that allocation provides no reason to infer that the Commercialization Agreement covered the distinct and substantially different invention claimed in the '998 patent.

### The '998 Patent Assignment Was Unrelated to the Commercialization Agreement.

STC next argues (at 6) that its December 2011 assignment to Sandia somehow itself had the effect of bringing the '998 patent within the scope of the Commercialization Agreement. STC's reasoning is flawed. The Commercialization Agreement covered commercialization of the '321 patent, and it nowhere purported to cover patents on other inventions that were *not* jointly developed merely because those patents later became jointly owned for other reasons. If STC wanted to add the '998 patent to the Commercialization Agreement after the December 2011 Assignment, STC needed to obtain Sandia's agreement to amend and broaden the Commercialization Agreement. STC did not. It is absurd to suggest, as STC does, that the December 2011 assignment acted as a time machine that magically added the '998 patent to the scope of the Commercialization Agreement without any joint agreement to such an expansion.

### Draper's Non-Contribution to the '998 Invention Is Critical.

STC argues (at 6) that Draper's lack of inventorship of the '998 patent is irrelevant because STC and Sandia supposedly understood that the covered INTELLECTUAL PROPERTY included inventions that each party considered entirely its own. But STC offers no evidence of any such intent, Sandia says otherwise in its opposition to STC's motion, and the agreements align with Sandia's understanding. As discussed above, the MOU was limited to jointly-developed, jointly-owned intellectual property. Moreover, the very paragraphs of the Commercialization Agreement "Background" section that STC cites make clear that Draper, Brueck, Zaidi, and Chu all participated in creating the covered INTELLECTUAL PROPERTY.

– 12 –

The point of the two paragraphs was to explain why both parties had an interest in that INTELLECTUAL PROPERTY: Sandia through Draper, and STC through Brueck, Zaidi, and Chu. Draper's lack of inventorship of the '998 patent is not only relevant; it is *fatal* to STC's claim that the Commercialization Agreement covers that patent.

### Sandia's 1994 Letter Was Limited to Inventions Made by Sandia Employees.

STC next argues (at 6) that interpreting the Commercialization Agreement to cover the '998 patent is consistent with a 1994 letter from Sandia to UNM. In fact, the 1994 letter further undermines STC's argument. It stated that "Sandia is proceeding with a waiver of title request with DOE" and that "[o]nce Sandia receives title, Sandia will enter into an agreement with UNM to allow UNM to be the exclusive licensing agent for the invention." [Doc. 218–4] The letter thus made clear that "the invention" of which UNM would be the exclusive licensor was an invention to which the Department of Energy (DOE) had to waive title. DOE had to waive title as to the '321 patent because Sandia's Draper co-invented that patent. By contrast, DOE had no title in the '998 patent to waive because Draper was not an inventor on that patent.

### The Commercialization Agreement Was Limited to One Joint Invention.

Finally, STC contends (at 7) that the Commercialization Agreement "covers all patents originating from the inventions created by all four inventors, whether made individually, or together." But the Agreement says no such thing. As discussed above, it was plainly limited to one patent covering a particular invention jointly made by Brueck, Zaidi, Chu, and Draper, not another patent on a different, later invention by Brueck, Zaidi, and two other UNM employees.

In sum, STC's argument that it can compel Sandia to join under the "exclusive licensee" exception to the normal standing rules fails at the outset because the contract that supposedly

conveyed that status (the Commercialization Agreement) does not extend to the '998 patent.

### 2. Even If the Commercialization Agreement Extended to the '998 Patent, It Did Not Make STC the Exclusive Licensee of Sandia

Even if the Commercialization Agreement could be read to cover the '998 patent, the Commercialization Agreement does not make STC Sandia's *exclusive licensee*. STC is a *co-owner* of the '998 patent, not a licensee of any kind. What is more, the rationale for allowing an exclusive licensee to join an owner involuntarily does not apply here.

The exclusive licensee exception originated in *Independent Wireless Telegraph Co. v. Radio Corporation of America*, 269 U.S. 459 (1926), in which the Supreme Court held that equity requires allowing an exclusive licensee to join its licensor/patent owner involuntarily because the owner effectively holds its patent "in trust" for its exclusive licensee and must not deprive that licensee of the exclusivity it bargained for by refusing to join an infringement suit:

> [T]he owner of a patent, who grants to another the exclusive right to make, use, or vend the invention, which does not constitute a statutory assignment, holds the title to the patent in trust for such a licensee, to the extent he must allow the use of his name as plaintiff in any action brought at the instance of the license in law or in equity to obtain damages for the injury to his exclusive right by an infringer, or to enjoin infringement of it.

*Id.* at 469.

When Rule 19 was adopted in 1937, the drafters followed *Independent Wireless* and recognized that a party may be involuntarily joined "in a proper case." *See* Fed. R. Civ. P. 19 committee note on 1937 adoption. Which cases are "proper" for involuntary joinder depends on substantive law, however. And in the patent context, they remain limited to those in which the plaintiff is an exclusive licensee and the party to be joined involuntarily is the patent owner. *See, e.g.*, *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1133 (Fed. Cir. 1995).

– 14 –

STC plainly is not Sandia's exclusive licensee of the '998 patent. By definition, an "exclusive licensee" is a *non-owner* whom the owner has granted both (1) rights to practice (make, use, sell, etc.) the invention and (2) the right to exclude others from practicing the invention. *See*, *e.g.*, *Independent Wireless*, 269 U.S. at 469 (referring to an exclusive licensee as one who has "the exclusive right to make, use, or vend the invention" and has *not* received a statutory assignment making it an owner); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995) (en banc) ("To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory.") (citing *Independent Wireless*). Here, STC was the sole owner of the '998 patent from the time UNM assigned its original ownership rights to STC until December 1, 2011. On that date, STC transferred partial ownership to Sandia, but STC still remained a co-*owner*. Sandia has never held the '998 patent "in trust" for STC, as *Independent Wireless* requires.

Contrary to STC's contention (at 3), nothing in the Commercialization Agreement purported to convert STC into Sandia's exclusive licensee of the '998 patent (or any other patent). As a patent owner, STC did not need a license from Sandia: it *already* had the right to practice its patents and the right to exclude others from practicing the claimed inventions (assuming patent validity and agreement of any co-owners). Moreover, STC points to nothing in the Commercialization Agreement that conveyed to STC the sole right to practice in any field or location, much less the right to exclude others from doing so without Sandia's consent.

STC observes (at 3) that the Commercialization Agreement made STC the "PATENTING LEAD" and "LICENSING PARTY," but STC never explains how that allocation

of responsibilities could make STC Sandia's exclusive licensee. And it did not. The PATENTING LEAD is merely responsible for securing intellectual property protection. [Doc. 218–6 Responsible Party ¶ 1] It does not have the sole right to practice in any field or location or to exclude others from doing so. STC was also designated the LICENSING PARTY, and as such STC may be the exclusive *licensor* of covered INTELLECTUAL PROPERTY because Sandia agreed to refrain from licensing the INTELLECTUAL PROPERTY and to refer licensing inquiries to STC. [*Id.* Responsible Party ¶ 3] But an exclusive *licensor* and an exclusive *licensee* are different things. Again, the Commercialization Agreement did not change STC's right to practice any covered patent, and it did not give STC any greater right to exclude others from practicing. In particular, although Sandia made STC its licensing agent, Sandia did not surrender its right to decide whether to join a suit against third parties that decline to pay for a license.

Furthermore, the policies that animated the Supreme Court's decision in *Independent Wireless* do not apply in this context. The Court's logic was that as a matter of equity, a patent owner should not be allowed to grant a party the right to practice to the exclusion others and then negate the conveyed exclusivity by refusing to join an infringement suit. 269 U.S. at 468–69. That logic does not apply to a situation involving co-owners. Absent a contractual waiver, a co-owner may practice a patented invention "without the consent of and without accounting to the other owners." 35 U.S.C. § 261. And absent a contractual waiver, "'one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit.'" *Ethicon*, 135 F.3d at 1468. Sandia made no such waivers here, and it is acting entirely legally and equitably in exercising its right not to join this infringement lawsuit.

## II.   EQUITY DOES NOT ALLOW STC TO INVOKE RULE 19(b) AND TREAT SANDIA, WHICH STC ITSELF BROUGHT INTO THIS DISPUTE, AS A DISPENSABLE PARTY

Tacitly recognizing that involuntary joinder under Rule 19(a) is improper, STC's primary argument is that even though STC injected Sandia into this dispute to avoid summary judgment of unenforceability, the Court should deem Sandia a dispensable party under Rule 19(b) and let STC proceed despite Sandia's joint ownership rights in the '998 patent. As a matter of law, however, each co-owner is ordinarily indispensable to a patent infringement lawsuit. No extraordinary circumstances in this case warrant proceeding without Sandia. In fact, the extraordinary circumstances resulting in Sandia's involvement were of STC's own creation, to avoid complete summary judgment of unenforceability, and thus dictate exactly the opposite result. Proceeding without Sandia also poses risks of prejudice to both Sandia and Intel.

In *Independent Wireless*, the Supreme Court recognized that "[t]he presence of the owner of the patent as a party is *indispensable*, not only to give jurisdiction under the patent laws, but also in most cases to enable the alleged infringer to respond in one action to all claims for infringement…." 269 U.S. at 468 (emphasis added). Case law makes clear that all co-owners— the entire ownership interest—must be present. *See, e.g., Moore v. Marsh*, 74 U.S. 515, 520–21 (1868) ("[W]here [an] assignment is of an undivided part of the patent, the action should be brought for every infringement committed subsequent to the assignment, in the joint names of the patentee and assignee, as representing the entire interest."); *Israel Bio-Engineering Project*, 475 F.3d at 1265 ("Where one co-owner possesses an undivided part of the entire patent, that joint owner must join all the other co-owners to establish standing."). That has to be so, not only to protect accused infringers from harassment by multiple co-owners, but also to protect other co-owners against, for example, a judgment invalidating claims or adverse claim constructions.

– 17 –

Tellingly, STC cites no cases holding that a co-owner of a patent was dispensable under Rule 19(b). STC cites *A123 Systems, Inc. v. Hydro-Quebec*, but there the Federal Circuit agreed with a district court that a field-of-use licensee could *not* invoke Rule 19(b) and sue without the patent owner. 626 F.3d 1213, 1220–22 (Fed. Cir. 2010). In cases involving multiple owners, courts have routinely rejected plaintiff co-owners' contentions that they can invoke Rule 19(b) and proceed without joinder of their co-owners. *See Bushnell, Inc. v. Brunton Co.*, 659 F. Supp. 2d 1150, 1164–65 (D. Kan. 2009) (holding that a co-owner's right to refuse to join an infringement suit both precluded involuntary joinder under Rule 19(a) and rendered the co-owner indispensable under Rule 19(b); case dismissed); *A10 Networks, Inc. v. Brocade Commc'ns Sys., Inc.*, No. 5:11–CV–05493–LHK, 2012 WL 1932878, *10–11 (N.D. Cal. May 29, 2012) (granting motion to dismiss and finding absent co-owners indispensable parties due to potential prejudice to them and danger that defendant would be subject to multiple lawsuits).

Intel is aware of only two cases in which the Federal Circuit has deemed co-owners dispensable under Rule 19(b), and both involved unusual facts far removed from those here. *Dow Chemical Co. v. Exxon Corp.*, 139 F.3d 1470 (Fed. Cir. 1998), held that the nominal patent owner, Exxon Chemical Patents, Inc., was dispensable because its parent corporation, Exxon Corporation, was a party and had both the legal duty and capability of protecting its wholly-owned subsidiary's interest. *Id.* at 1479. Likewise, in *Dainippon Screen Manufacturing Co. v. CFMT, Inc.*, 142 F.3d 1266 (Fed. Cir. 1998), the nominal patent owner was merely a holding company, and the Federal Circuit (in dictum) deemed it dispensable because its interests were well protected by its parent, which was present in the case. *Id.* at 1272–73.

In this case, Sandia is an independent co-owner, not a subsidiary of STC, and no extraordinary factors justify allowing STC to proceed without Sandia as a party. To the contrary, an analysis under Rule 19(b) makes clear that the remnants of STC's suit must be dismissed.

Rule 19(b) provides that if a required party cannot be joined, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." The rule lists four non-exclusive factors for the court to consider:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>> (A) protective provisions in the judgment;
>> (B) shaping the relief; or
>> (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

As to the first factor, any judgment rendered in Sandia's absence would likely prejudice Sandia, Intel, or both. For example, if this Court were to invalidate any claims, Sandia would be unable to sue other defendants on those claims. Even if the claims survived, *stare decisis* and the need to join STC in future cases would effectively bind Sandia to adverse claim constructions. If Sandia were *not* bound by this Court's judgment, then *Intel* would be prejudiced because Sandia would be free to sue it a second time for the same conduct. Indeed, allowing STC to proceed without Sandia would expose Intel to risks of harassment from multiple sources that the common ownership requirement of the terminal disclaimer was designed to prevent in the first place. *See*

– 19 –

*In re Fallaux*, 564 F.3d 1313, 1319 (Fed. Cir. 2009) (citing "harassment by multiple assignees" as a reason for double-patenting rejections). To top it off, it would be highly unfair to Intel to let STC survive summary judgment of unenforceability by unilaterally assigning co-ownership rights to Sandia, but then turn around and treat Sandia's presence in this case as insignificant.

STC's counterarguments on this point are counterfactual. STC asserts (at 8) that "Sandia's refusal to join in the suit clearly indicates that it has no interest in defending the validity of the patent or any interest in the outcome of the infringement issue" and that "Sandia has made it clear that it has no intention to pursue an action against Intel." But neither assertion is true. Sandia simply "prefers to take a neutral position with respect to this matter." [Doc. 224 at 2] STC cites no evidence that Sandia has disavowed any interest in pursuing infringement claims against other parties, or that Sandia has waived any ability to assert the '998 patent against Intel at some point in the future. Furthermore, Sandia may want to sell its interest, and an invalidity finding or narrow claim construction would greatly diminish, if not destroy, the value of that interest. In any event, STC fails to explain why the Court should disregard the absence of the very party that STC inserted into this dispute in order to survive summary judgment.

As to the second factor, STC has proposed no way to lessen or avoid the potential prejudice to Sandia and Intel. And any restriction that mitigated the prejudice to Sandia (such as a ruling that Sandia is not bound by the outcome) would end up prejudicing Intel.

As to the third factor, a judgment would not be "adequate" if Sandia were not a party and not bound by the judgment. In this context, "adequacy refers to the 'public stake in settling disputes by wholes, whenever possible.'" *Republic of Philippines v. Pimentel*, 553 U.S. 851, 870 (2008). The dispute will not be wholly resolved if Sandia is not bound by the judgment.

As to the fourth factor, STC *does*, in its words (at 8) "have an alternate route to pursue the infringement claim." STC was the sole owner of the '998 patent and had standing to sue alone until December 2011, when it assigned a partial interest to Sandia. STC could regain standing to sue by reacquiring Sandia's interest in the '998 patent, and it could solve its unenforceability problem by acquiring full ownership of the '321 patent as well. Of course, STC presumably would have to pay to acquire those rights. But STC should have paid to fix these problems a long time ago, *before* going to court and suing numerous parties on the '998 patent.

Finally, although STC portrays itself (at 8) as a victim of circumstances, the Court should bear in mind that STC has only itself and its parent, UNM, to blame for its current predicament. UNM voluntarily executed the terminal disclaimer and accepted the common ownership condition to obtain the '998 patent. UNM or STC could have bought out Sandia's interest in the '321 patent to ensure enforceability, but they did not. Instead, UNM assigned its interests to STC, and STC began suing to enforce the '998 patent even though it was plainly unenforceable under the terminal disclaimer. Moreover, no one compelled STC to assign an interest in the '998 patent to Sandia once Intel raised the unenforceability problem last fall. Even then, STC could have solved that problem by buying Sandia's interest in the '321 patent, but it did not. Instead, desperate to keep this lawsuit alive and not wanting to incur any expense, STC voluntarily and unilaterally assigned an interest in the '998 patent to Sandia without bothering to check whether Sandia was willing to participate. STC can hardly claim that "equity and good conscience" require extraordinary judicial relief here.[4]

---

[4] STC also argues that the Court should invoke Rule 19(b) to protect Sandia's "quasi-governmental" neutrality. As Sandia's opposition shows, however, the premise is flawed because Sandia is a privately owned corporation, not a governmental agency. [Doc. 224 at 2 n.2]

### III.   STC's Motion to Reconsider the Court's Summary Judgment Ruling Is Procedurally Improper and Substantively Meritless

Finally, STC moves (at 9) for reconsideration of the Court's decision that UNM and STC had sole ownership of the '998 patent until December 2011. With the benefit of another month's reflection, STC has hatched a new theory of why it has always shared ownership in the '998 patent—this time because DOE supposedly took title to the claimed invention under the Atomic Energy Act and then granted title to Sandia and UNM jointly in the mid-1990s. That argument is both procedurally barred and substantively wrong.

### A.   STC's New Legal Argument Improperly Relies on Evidence that Was Available Before Summary Judgment Was Sought or Granted

This Court has recognized that motions for reconsideration are appropriate only in limited circumstances. Motions for reconsideration *are* appropriate to address intervening changes in controlling law, new evidence *previously unavailable*, and clear errors or manifest injustices. *J.M. v. N.M. Dep't of Health*, No. Civ. 07–0604 RB/ACT, at 3 (Mar. 5, 2009). Reconsideration motions are "'*not* appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing.'" *Id.* (emphasis added) (quoting *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)). Thus, reconsideration is *not* warranted where the motion merely advances arguments or facts that were available at the time of the original motion.

Here, STC raises a new legal argument, but both that argument and the facts on which it is based were available when the parties briefed Intel's summary judgment motion. STC's "new evidence" comes from a declaration of Sandia's Kevin Bieg. But Mr. Bieg is not a new witness, and his June 6, 2012, declaration does not address facts that have arisen since Intel's motion. Mr. Bieg testified as Sandia's Rule 30(b)(6) witness last fall, and at his deposition he discussed

the very statute, 42 U.S.C. § 5908, on which STC now relies. [*See* Ferrall Decl. Ex. 2 (11/17/11

Tr.) at 25–26] STC had the opportunity to question Mr. Bieg then, and it could have obtained a

declaration that contained every fact set forth in his recent declaration before the Court's ruling.

Simply put, STC has no excuse for failing to advance its new theory in a timely fashion.

Summary judgment was properly entered on the arguments and evidence timely presented, and

STC is not entitled to relitigate the issue now.

> **B.      Federal Retention-of-Title Rules Are Irrelevant Because**
> **No Sandia Employee Was an Inventor of the '998 Patent**

Aside from its procedural defects, STC's new theory of Sandia ownership has not

substantive merit. STC previously argued that Sandia shared title in the '998 patent because

Bruce Draper assigned to UNM, and UNM assigned to Sandia, interests in the invention that

became the '321 patent. This Court properly rejected that argument. As the Supreme Court has

stressed, patent ownership rights derive from inventorship, and Mr. Draper had no ownership

rights in the '998 patent because he was not an inventor of the invention claimed in that patent.

[Doc. 206 at 9–15] STC's new argument is that DOE automatically took title to the invention

claimed in the '998 patent and granted title to Sandia and UNM at their request. But the flaw in

that theory is the same as the Court recognized previously: although Mr. Draper was an inventor

on the '321 patent, he was *not* (as even STC concedes, at 6) an inventor on the '998 patent.

Federal retention-of-title rules apply only when an employee of a federal entity has made

an invention. In particular, 42 U.S.C. § 5908 applies when "any invention is *made or conceived*

*in the course of or under any contract of the Secretary*, other than nuclear energy research,

development, and demonstration pursuant to the Atomic Energy Act of 1954" (emphasis added).

Here, no Sandia employee made an inventive contribution to the '998 patent. Contrary to STC's

suggestion (at 9), the Atomic Energy Act cannot "trump" when it does not even apply.

Nor does Mr. Bieg's declaration support STC's claim. He agrees that the statute "gives the Government title to inventions made or conceived in the course of or under Sandia's contract with DOE …." [Doc. 218–2 ¶ 8] But inventions by UNM employees alone are not inventions made or conceived under Sandia's contract with DOE. Indeed, although Mr. Bieg states that DOE granted Sandia's request to retain title to "the invention claimed [in] the '321 patent" [*id.*], he does *not* say that DOE's waiver of title applied to the *'998* patent. In fact, the document he attaches confirms that Sandia elected to take title only to the invention to which Mr. Draper contributed—the invention of the '321 patent. [*Id.* at 12–17 of 23 (naming Draper as inventor)] Sandia agrees that Mr. Bieg's declaration does not address the '998 patent. [Doc. 224 at 9–10]

At bottom, STC is engaging in the same blurring of inventions that the Court has already seen through. STC is trying to argue that because a Sandia employee co-invented the '321 patent, the federal government had an ownership in the '998 patent. That does not follow. Even if, as STC contends, the '998 patent was a continuation-in-part of the application that led to the '321 patent, the Draper/Sandia contribution to the '321 patent was not carried over to the '998 patent. Because no Sandia employee participated in the '998 patent's invention, Sandia had no rights in the '998 patent until STC (unilaterally, and for litigation reasons) assigned Sandia an interest in December 2011. The Court's ruling was entirely correct, and reconsideration should be denied.

### Conclusion

STC's motion should be denied in its entirety. Instead, as explained in Intel's cross-motion, the Court should dismiss STC's remaining claims (for infringement after December 1, 2011) for lack of standing and put an end to a case that STC never should have filed.

Dated: July 10, 2012.                    Respectfully submitted,

                                         ATKINSON, THAL & BAKER, P.C.

                                           /s/ *Clifford K. Atkinson*
                                         Douglas A. Baker
                                         Clifford K. Atkinson
                                         201 Third Street, N.W., Suite 1850
                                         Albuquerque, NM 87102
                                         (505) 764–8111

                                         KEKER & VAN NEST LLP

                                         Robert A. Van Nest
                                         Brian L. Ferrall
                                         Benedict Y. Hur

                                         PERKINS COIE LLP

                                         Chad S. Campbell
                                         Timothy J. Franks

                                         *Attorneys for Defendant Intel Corporation*

**Certificate of Service**

The undersigned hereby certifies that on July 10, 2012, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all counsel who have entered an appearance in this action.

ATKINSON, THAL & BAKER, P.C.

/s/ *Clifford K. Atkinson*
Clifford K. Atkinson

20336-1313/LEGAL23953212.5