UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

STC.UNM,

         Plaintiff,

    v.

INTEL CORPORATION,

         Defendant.

Civil No. 1:10–cv–01077–RB–WDS

## INTEL'S REPLY IN SUPPORT OF ITS CROSS-MOTION TO DISMISS STC'S REMAINING CLAIMS FOR LACK OF STANDING

Clifford K. Atkinson
Douglas A. Baker
Justin D. Rodriguez
ATKINSON, THAL & BAKER, P.C.
201 Third Street, N.W., Suite 1850
Albuquerque, NM 87102
(505) 764–8111

Robert A. Van Nest
Brian L. Ferrall
Benedict Y. Hur
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391–5400

Chad S. Campbell
Timothy J. Franks
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012
(602) 351–8000

**Introduction**

In its Reply in support of its Rule 19 motion and Response to Intel's cross-motion to dismiss [Docs. 230, 235], STC urges the Court to join Sandia involuntarily under Rule 19(a) because Sandia supposedly made STC the exclusive licensee of the '998 patent under the Commercialization Agreement. That argument fails, and the remnants of STC's case should be dismissed, for two independent reasons. First, as this Court has already recognized [Doc. 206 at 5], the Commercialization Agreement never covered the '998 patent. The Agreement covered jointly owned intellectual property that was jointly invented by four particular inventors and described in a particular disclosure statement. The '998 patent did not satisfy those criteria. Second, the Agreement merely made STC an exclusive *licensor* of covered intellectual property, not Sandia's exclusive *licensee*. The Commercialization Agreement provides no grounds for STC to force Sandia's participation in a patent infringement suit that Sandia prefers not to join.

Nor does Rule 19(b) provide any basis to deny Intel's motion to dismiss. STC argues that "equitable considerations" require allowing it to proceed without joining Sandia. But permitting STC to proceed without Sandia would be far from equitable. STC ignores that its standing problem is of its own creation: STC voluntarily and unilaterally injected Sandia into this dispute and relied on Sandia's new co-ownership to survive summary judgment of unenforceability, yet it now demands extraordinary judicial relief so that it can proceed in Sandia's absence. STC should not be heard to argue that the very co-owner essential to the enforceability of the patent is now dispensable. Furthermore, contrary to STC's suggestion, allowing STC to proceed without joinder of Sandia would indeed risk significant prejudice to both Intel and Sandia.

– 1 –

Finally, STC's plea for reconsideration of the Court's summary judgment ruling cannot prevent dismissal of this case. Although STC claims to rely on new evidence that was previously unavailable, it could have and should have pursued its latest, belated co-ownership theory before the Court granted partial summary judgment. Intel notified STC of its unenforceability defense on November 22, 2011, and summary judgment was granted on May 8, 2012. STC thus had over five months to depose or obtain a declaration from Kevin Bieg. In any event, even if STC's new theory were not procedurally barred, it is a non-starter. As even STC admits, no Sandia employee was an inventor of the '998 patent. It follows that federal retention-of-title rules never applied. As the Court has held, Sandia had no interest in the '998 patent until December 1, 2011.

In sum, the Court has correctly dismissed STC's claims for infringement before December 1, 2011, and the rest of STC's case should now be dismissed for lack of standing.

## Argument

### I.   STC CANNOT INVOLUNTARILY JOIN SANDIA UNDER RULE 19(a)

#### A.   As the Court Has Already Recognized, the Commercialization Agreement Between STC and Sandia Does Not Cover the '998 Patent

The scope of the Commercialization Agreement was limited to particular intellectual property jointly developed by a particular set of UNM and Sandia inventors and jointly owned by STC and Sandia as a result. By its terms, the Commercialization Agreement covers the '321 patent. In principle, it could extend to newly issued, related patents jointly invented by the same four inventors and described in the same invention disclosure document. But both the text and the Background section of the Commercialization Agreement make clear that it does not cover the '998 patent, which involved a different invention made by a different set of inventors, all of

whom worked for UNM and none of whom worked for Sandia. Sandia concurs with this view [Docs. 224, 239–1], and STC's arguments to the contrary do not withstand scrutiny.

By its terms, the Commercialization Agreement was adopted pursuant to a 2006 MOU, the scope of which was expressly limited to intellectual property jointly created by UNM and Sandia. [Doc. 218–5 Preamble & ¶¶ 1(a), (c)–(g), 2] Consistent with the MOU, the Background section of the Commercialization Agreement listed four inventors (Draper of Sandia and Brueck, Zaidi, and Chu of UNM) who had made "contributions to the INTELLECTUAL PROPERTY" resulting in Sandia and STC's joint ownership of that intellectual property. [Doc. 218–6 Background ¶¶ 1–2] That listing of inventors exactly matches the inventorship of the '321 patent, but it differs radically from the inventorship of the '998 patent, which includes two other UNM employees (Hersee and Malloy) and excludes both Draper and Chu. Furthermore, the Commercialization Agreement's definition of covered "INTELLECTUAL PROPERTY" expressly covers the '321 patent but not the '998 patent. STC persists in ignoring that the '998 patent is *not* the '321 patent issued in 1998, the '998 patent is *not* entitled "Method for Manufacture of Quantum Sized Periodic Structures in Si Materials," and the '998 patent was *not* invented by Draper or Chu. [*See id.* Intellectual Property ¶ 1]

STC argues (at 2) that the Commercialization Agreement nonetheless covers the '998 patent because "INTELLECTUAL PROPERTY" includes any "technology disclosed" in UNM–322/SD–5308, the docket numbers assigned to the technology jointly developed by Draper, Brueck, Zaidi, and Chu.[1] That argument is untenable. The mere fact that certain

---

[1] STC tries to buttress this argument by suggesting that the scope of the disclosure in UNM–322 (the pre-patent disclosure) was broader than the scope of UNM–322.CON (the

technology was mentioned in UNM–322/SD–5308 does not make it jointly developed, jointly

owned "INTELLECTUAL PROPERTY." For example, the UNM–322 disclosure discussed

prior art, yet UNM and Sandia could not and did not claim ownership of the prior art. Instead,

the covered "INTELLECTUAL PROPERTY" was limited to rights in inventions that were

both jointly made by the Sandia and UNM employees listed and disclosed in the identified

disclosure document. Because the '998 patent involved a different invention and had a different

(and UNM-only) set of inventors, UNM used a different docket number, UNM–482, for the

invention that became the '998 patent. [Doc. 179–8] Sandia had no docket number for that

invention because it had no interest in it. STC cannot credibly argue that the Agreement covers

the '998 patent when the title, inventors, patent number, and docket number of the '998 patent

appear nowhere in the definition of covered "INTELLECTUAL PROPERTY."[2]

 Contrary to STC's suggestion (at 1), this correct interpretation, which Sandia endorses,

neither rewrites the Commercialization Agreement nor conflicts with "practical sense" by

limiting it to the '321 patent and excluding "related technology." The Commercialization

Agreement would indeed cover related patents if they were invented by the same set of inventors

and if the technology were set forth in the specified disclosure. But the Commercialization

---

disclosure in the '321 patent itself). But there is no evidence suggesting any difference in the
scope or ownership of the technology encompassed within UNM–322 and UNM–322.CON.

 [2] STC also fails to address circumstantial evidence that the parties never intended the
Commercialization Agreement to cover the '998 patent. For example, the parties allocated
proceeds according to the number of inventors contributed by each party—*e.g.*, Sandia was to
receive ¼ of the proceeds for the '321 patent while STC was to receive ¾ (before adjustment for
contractual responsibilities). [Doc. 218–6 at 3] That allocation would have been inappropriate for
the '998 patent, which has no Sandia inventors, and for a combination of the '321 and '998
patents, which have a total of one Sandia inventor and five UNM inventors. Moreover, Sandia's
sur-reply confirms that, in fact, STC has *not* shared commercialization proceeds from the '998
patent with Sandia. [Doc. 239–1 at 4]

Agreement cannot be stretched to cover intellectual property developed by a different set of inventors—including other UNM inventors who were complete strangers to the original disclosure, but no one from Sandia. It is both practical and logical for parties to negotiate different contract terms for differently developed and differently owned patents.

STC's related argument (at 3–4) that the '998 patent became covered "INTELLECTUAL PROPERTY" when the PTO designated that patent a continuation-in-part of the '321 patent defies both history and the language of the Commercialization Agreement. According to STC (at 3–4), the parties contemplated additions such as the '998 patent because STC was named "PATENTING LEAD" to perform "forward looking" duties such as "patenting," "prosecution," and "other protection." But STC ignores the crucial fact that it obtained continuation-in-part status for the '998 patent in *December 2008*, six months *before* execution of the Commercialization Agreement. [Doc. 179–13] If STC and Sandia had truly intended the Commercialization Agreement to cover the '998 patent, they would have included that patent and its inventors from the start. STC presents no evidence otherwise. In any event, as PATENTING LEAD, STC is responsible only for patenting, prosecution, and protection of covered "INTELLECTUAL PROPERTY," and that "INTELLECTUAL PROPERTY" was limited to the joint inventions of Sandia's Draper and UNM's Brueck, Zaidi, and Chu.

**B.    Regardless of Its Scope, the Commercialization Agreement Did Not Make STC Sandia's *Exclusive Licensee***

STC's argument for compelling joinder under Rule 19(a) fails for a second, independent reason. *Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459 (1926), allows an *exclusive licensee* to compel joinder of the owner that granted it an exclusive license, but STC is not Sandia's exclusive licensee. By definition, an "exclusive licensee" is a *non-owner*

–5–

to whom the owner has granted both (1) the exclusive right to practice the invention (make, use, sell, etc.) and (2) the right to exclude others from practicing the invention. *See Independent Wireless*, 269 U.S. at 469; *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995) (en banc). As a *co-owner*, STC did not need a license to practice its own patents. *See* 35 U.S.C. § 262 ("In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention ... without the consent of and without accounting to the other owners."). Moreover, in the Commercialization Agreement Sandia granted STC neither the exclusive right to practice any invention nor the right to prevent others from practicing any invention.

STC ignores its co-owner status and continues to conflate two distinct concepts: that of exclusive *licensee* and exclusive *licensor*. STC argues (at 6) that it is an exclusive *licensee* under the Commercialization Agreement because it "provided consideration to Sandia in exchange for ... the exclusive right *to license* the INTELLECTUAL PROPERTY" (emphasis added). But STC's right to license third parties and collect licensing income merely made STC the exclusive *licensor*. Again, Sandia granted STC neither the sole right to practice the claimed inventions nor the sole right to decide whether to sue to exclude others from practicing those inventions.[3]

Sandia is not, as STC contends (at 6), "seek[ing] to frustrate the bargain it made" with STC because Sandia has not impeded STC's right to license others. Sandia is merely exercising its right to decide whether to join a lawsuit against third-parties. Unless a co-owner surrenders its rights by contract, it retains not only the right to practice the patent, but also the "right to impede

---

[3] STC has made no claim that Sandia contractually waived its right to decide whether to join enforcement suits on patents covered by the Agreement, which is the only other basis for compelling joinder. *See Willingham v. Lawton*, 555 F.2d 1340, 1344–45 (6th Cir. 1977).

[its] co-owner's ability to sue infringers by refusing to voluntarily join in such a suit." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998). As Sandia's sur-reply observes, the Commercialization Agreement "does not say anything about enforcement actions, does not permit STC alone to bring enforcement actions, and certainly does not obligate Sandia to join an enforcement action." [Doc. 239–1 at 3] Thus, Sandia has acted both legally and equitably in exercising its right not to join this suit, and neither *Independent Wireless* nor the equitable considerations that animated it support compulsory joinder in this case.

## II.   EQUITY DOES NOT ALLOW STC TO TREAT SANDIA AS A DISPENSABLE PARTY UNDER RULE 19(b)

STC is strangely silent on the critical equitable consideration governing the application of Rule 19(b) in this case. UNM and STC created an unenforceability problem by agreeing to and then failing to live up to the common ownership requirement of the '998 patent's terminal disclaimer. To render the '998 patent enforceable and salvage a portion of its term, STC unilaterally assigned an undivided ownership interest to Sandia. But having voluntarily and unilaterally injected Sandia into this dispute, STC cannot turn around now and dismiss Sandia's co-ownership status as immaterial. Sandia's presence as a co-owner was indispensable to creating an enforceable patent to litigate, and given that fact, Sandia cannot be diminished as a mere irrelevant and dispensable bystander.

Moreover, contrary to STC's suggestion, the factors listed in Rule 19(b) weigh against treating Sandia as a dispensable party. Indeed, proceeding without Sandia would threaten significant prejudice to both Sandia and Intel.

For its part, Sandia would be unable to sue other defendants on any claims that this Court had invalidated. Even if all claims survived, *stare decisis* would effectively bind Sandia to any

adverse claim constructions. Such findings would also greatly diminish, if not destroy, the value of Sandia's ownership interest if it were to later sell that interest to a third party. STC dismisses these concerns by claiming (at 6) that Sandia "has not opposed the application of Rule 19(b)." But Sandia *has* disputed STC's primary basis for Rule 19(b) relief, clarifying that Sandia "is not, as argued by STC, a 'quasi-governmental entity'" whose neutrality should be preserved as a matter of public policy. [Doc. 224 at 2 n.2] Moreover, Sandia certainly has not *supported* STC's efforts to proceed unilaterally.

As to Intel, STC points to no actual protection from the obvious potential prejudice of a further lawsuit by other parties for the same alleged infringement. In particular, STC cites no evidence that Sandia has waived or released its right to sue Intel for infringement of the '998 patent. Even if credited, STC's Fulghum Declaration does not, as STC contends (at 7), "rebut Intel's apprehension about future suits from Sandia." It simply alleges second-hand information through Sandia that, as of January 12, 2012, DOE preferred that Sandia not take any further action regarding assignment or license of its recently obtained rights under the '998 patent. [*See* Doc. 236 ¶ 3; STC's Resp. to Intel's Interrog. No. 33][4] Moreover, Sandia's sur-reply questions both the accuracy of Fulghum's statement and rebuts the conclusions STC draws from it, making clear that DOE has provided no such instruction to Sandia and that Sandia has made no firm commitment not to pursue Intel in the future. [Doc. 239–1 at 2] STC also ignores that Sandia could sell its interest in the '998 patent to others with no qualms about suing Intel.

---

[4] STC failed to disclose these facts in its interrogatory response served January 18, 2012. As a result, neither Intel nor the Court was aware of STC's failed efforts to correct its standing problem at the hearing on the motion for summary judgment. STC finally disclosed these facts on July 25, 2012, when it sought to use them for its own advantage.

STC argues (at 7) that Intel's concerns are overblown because Sandia "would lack standing to bring a suit on its own" and "could not sue without STC." That argument, however, is ironic: STC's proposition (that as a matter of substantive patent law, one co-owner can unilaterally prevent another co-owner from suing) would defeat STC's own motion. Moreover, if STC were allowed to proceed alone under Rule 19(b), it is hard to see why Sandia or an assignee of Sandia's interest could not equally seek to proceed alone in a later case.

## III.   STC's Motion to Reconsider Summary Judgment Is Procedurally Improper and Substantively Meritless

As a last gasp to prevent dismissal, STC continues to urge the Court to reconsider its grant of partial summary judgment. That motion for reconsideration is doubly flawed.

To begin with, STC concedes (at 7–8) that the facts on which its new argument for co-ownership before December 1, 2011, relies were available when the parties briefed Intel's summary judgment motion last spring. Indeed, STC learned of Intel's unenforceability defense on November 22, 2011, when Intel's counsel advised STC's counsel of the problem in detail by letter. STC's discovery responses demonstrate continual contact between STC and Sandia from December 2011 through May 2012 [STC's Resp. to Intel's Interrog. No. 33], during which time STC had ample opportunity to question or obtain a declaration from Kevin Bieg before the summary judgment ruling. STC identifies no limitation on its ability to contact or reach Mr. Bieg during this time, nor does it allege that any of the facts on which it now relies arose after summary judgment was granted. STC has no justification for not having advanced its new theory in a timely fashion, and that alone is fatal to its motion. *See J.M. v. N.M. Dep't of Health*, No. Civ. 07–0604 RB/ACT (D.N.M. Mar. 5, 2009) (reconsideration unwarranted when motion merely advances arguments or facts available at time of original motion).

In any event, STC's reconsideration request is substantively meritless, as it misunderstands the Atomic Energy Act and misconstrues STC's own exhibits. Federal retention-of-title rules apply only when an employee of a federal entity has made an invention. *See* 42 U.S.C. § 5908 (automatic vesting provision applies when "any invention is *made or conceived in the course of or under any contract of the Secretary*") (emphasis added). As even STC concedes, no Sandia employee made any inventive contribution to the '998 patent. Without such a contribution, DOE *could not* have automatically retained an interest in the patent and *could not* have granted an interest to Sandia or anyone else. Simply put, DOE has no legal interest in which it can retain title unless there was a federally-affiliated inventor, and there was indisputably no federally-affiliated inventor on the '998 patent.

Bieg Deposition Exhibit 93 does not support a contrary result. It simply confirms that the DOE automatically obtained title to, and granted UNM an interest in, an invention entitled "Method for Manufacture of Quantum-Sized Periodic Structures in Si Materials," invented by Brueck, Chu, and Zaidi, "employees of the University of New Mexico," and Draper, an "employee of Sandia Corporation." [Doc. 218–3] The referenced invention was unquestionably the '321 patent, not the '998 patent.

Nor are those two inventions "identical" as STC contends. The PTO designated the '998 patent a "continuation-*in-part*" of the '321 patent, not a *continuation*, meaning that the '998 patent issued from an application "repeating some substantial portion or all of the earlier nonprovisional application and *adding matter not disclosed*" in the parent patent application. *Compare* MPEP § 201.08 (describing continuations-in-part) *with* MPEP § 201.07 (describing continuations as a "second application *for the same invention* claimed in a prior nonprovisional

application") (emphasis added). Nor was the PTO's obviousness-type double patenting rejection of the '998 patent a finding of "identity" of inventions. It was merely a finding that one or more claims of the '998 patent would have been obvious in light of the '321 patent. Regardless of whether that ruling was right or wrong (UNM contended at the time that it was wrong), it does not suggest that the '998 and '321 patents covered the same invention, much less that the federal government owned and assigned to Sandia an interest in the '998 patent even though no Sandia employee qualified as an inventor of the '998 patent.

### Conclusion

It is time for this case, and the burden on the Court's and parties' resources, to end. The Court should enter final judgment (1) dismissing STC's claims for infringement before December 1, 2011, with prejudice because the '998 patent was unenforceable until that date, and (2) dismissing STC's claims for infringement on and after December 1, 2011, without prejudice because STC lacks standing to sue without its co-owner.

Dated: August 17, 2012.

Respectfully submitted,

ATKINSON, THAL & BAKER, P.C.

  /s/ Clifford K. Atkinson
Douglas A. Baker
Clifford K. Atkinson
Justin D. Rodriguez
201 Third Street, N.W., Suite 1850
Albuquerque, NM 87102
(505) 764–8111

KEKER & VAN NEST LLP

Robert A. Van Nest
Brian L. Ferrall
Benedict Y. Hur

PERKINS COIE LLP

Chad S. Campbell

Timothy J. Franks

*Attorneys for Defendant Intel Corporation*

## Certificate of Service

The undersigned hereby certifies that on August 17, 2012, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all counsel who have entered an appearance in this action.

ATKINSON, THAL & BAKER, P.C.

　/s/ *Clifford K. Atkinson*　

Clifford K. Atkinson