IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

STC.UNM,

        Plaintiff,

vs.                                                     No. 10-cv-1077 RB/WDS

INTEL CORPORATION,

        Defendant.

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on STC.UNM's ("STC's") Motion to Correct Standing and to Reconsider, filed June 13, 2012 (Doc. 218), and Intel Corporation's ("Intel's") Cross-Motion to Dismiss STC's Remaining Claims for Lack of Standing, filed July 10, 2012 (Doc. 228). Having considered the submissions of the parties, relevant law, and being otherwise fully advised, the Court **DENIES** STC's motion and **GRANTS** Intel's cross-motion.

### I.      Background

This case arises from Intel's alleged infringement of a patent, owned by STC, covering photolithography techniques in the manufacture of semiconductors. The Court has previously ruled on several motions in this case, the most significant of which being Intel's Motion for Summary Judgment for Unenforceability. (*See* Doc. 206). The motion required the Court to consider Intel's contention that the patent at issue, United States Patent No. 6,042,998 ("the '998 patent"), was unenforceable as a matter of law because it and a prior patent, United States Patent No. 5,705,321 ("the '321 patent"), are not commonly owned. While common ownership would not ordinarily be required to render a patent enforceable, in this case, the United States Patent and Trademark Office ("USPTO") refused to issue the '998 patent until a terminal disclaimer

was submitted requiring, among other things, the common ownership of the '321 patent and the pending '998 patent. (Doc. 206 at 4-5).

After extensive review and thorough consideration, the Court determined that the inventions incorporated into the patent application ultimately issued as the '321 patent were invented by four persons: three University of New Mexico ("UNM") employees, Steven Brueck, An-Shyang Chu, and Saleem H. Zaidi; and one Sandia[1] employee, Bruce Draper. (Doc. 206 at 2-3). The application was filed June 6, 1995 and the '321 patent issued January 6, 1998. (*See* Doc. 179 Ex. W at 1). The interests of the co-inventors in the application that became the '321 patent were ultimately assigned to their respective employers. (Doc. 206 at 3). UNM transferred its full interest in patent '321 to STC in July of 2002. (*Id.* at 5).

The invention resulting in the '998 patent, on the other hand, was invented by two of the '321 co-inventers, Brueck and Zaidi, as well as two other UNM employees, Steve Hersee and Kevin Malloy. (*Id.* at 4). The application that ultimately resulted in the '998 patent was filed on September 17, 1997, and the patent issued on March 28, 2000. (Doc. 179 Ex. G at 1). The '998 patent documents showed that the assignee was UNM and that the patent was subject to a terminal disclaimer. (*Id.*) The terminal disclaimer included language attesting to UNM's ownership of full interest in the application that issued as the '998 patent. (Doc. 206 at 4). UNM transferred ownership of its interest in patent '998 to STC in August of 2007. (*Id.* at 5). At a later date, and at STC's request, the USPTO issued a Certificate of Correction to add language that patent '998 is a continuation-in-part of patent '321. (*Id.*) On December 1, 2011, STC assigned an undivided interest in patents '998 and '321 to Sandia. (*Id.* at 15).

---

[1] For purposes of this Order, the Court will use the term "Sandia" rather than referring to "Sandia Corporation" or "Sandia National Laboratories." Any dispute regarding the relationship between Sandia Corporation and Sandia National Laboratories is irrelevant for present purposes. (*See* Doc. 206 at 15-22).

Based on the fact that Draper did not co-invent any claims of the '998 patent, a fact admitted by STC, the Court concluded that Draper had no interest in the '998 patent to assign to his employer, Sandia. (Doc. 206 at 11-15). Accordingly, until STC assigned the interest to Sandia on December 1, 2011, the Court concluded, Sandia did not own an interest in the '998 patent and the defect in ownership rendered it unenforceable as a matter of law. (*Id.* at 15, 22). However, the Court did not resolve the issue of enforceability after December 1, 2011. Intel contended that Sandia Corporation and Sandia National Laboratories were different entities and that, as a result, the issue of common ownership had not been cured by the December 1 assignment. However, the Court found the parties' evidence regarding the identity of the two entities insufficient. (*Id.* at 15-22). Thus, the Court did not determine whether the patent was unenforceable from December 1, 2011 through its expiration. The Court noted that STC's December 1 assignment did generate an issue of standing, and that issue is now fully briefed.

Additional background information is required to fully address the issues before the Court. First, the parties make reference to a technology disclosure that was docketed with UNM as UNM-322 and with Sandia as SD-5308. This was the original technical disclosure of the four inventors named in the '321 patent, and it is entitled "Method for Fabrication of Quantum Wires and Quantum Dots." (Doc. 218 Ex. A). Following this disclosure, a patent application was filed, terminated by the inventors, and refiled as the application resulting in the '321 patent. (Doc. 206 at 2-3).

During the patenting process for the terminated patent application and subsequently the '321 patent, Sandia and UNM sought to obtain title to the invention from the Department of Energy ("DOE") pursuant to the Atomic Energy Act, 42 U.S.C. § 5908. (Doc. 218 Ex. B). The DOE granted UNM's request for an "undivided interest" in the "invention" entitled "Method for

Manufacture of Quantum-Sized Periodic Structures in Si Materials" in December of 1993. (Doc. 218 Ex. C). The DOE approved Sandia's request to retain title of the same invention on June 29, 1995. (Doc. 218 Ex. B at 17). Sandia had previously expressed to UNM that, once it obtained title, it would enter an agreement with UNM to make UNM "the exclusive licensing agent for the invention." (Doc. 218 Ex. D).

In August of 2006, Sandia, UNM, and STC executed a Memorandum of Understanding ("MOU") regarding the patenting, licensing and royalty sharing of jointly owned inventions and works of authorship. (Doc. 218 Ex. E). The MOU states that one party will be responsible for the licensing, patenting, and protection of subject inventions and contemplates the creation of a Commercialization Agreement for each subject invention. (*Id.*)

The relevant Commercialization Agreement was executed in June of 2009, designated STC as the exclusive licensing agent, and covered jointly-owned "Intellectual Property" defined as follows:

> Technology was disclosed to STC on September 20, 1993 in SD-5308 (Sandia) / UNM-322 (STC)
> U.S[.] Issued Patent No. 5,605,321 issued on January 6, 1998
> Title: "*Method for Manufacture of Quantum Sized Periodic Structures in Si Materials*"
> Inventors: Steven R.J. Brueck, Saleem H. Zaidi, An-Shyang Chu, and Bruce L. Draper.

(Doc. 218 Ex. F at 1). The "Background" section of the Commercialization Agreement explains that one inventor, Draper, was a Sandia employee at the time that the Intellectual Property was developed, while the remaining three were employees of UNM. (*Id.*) Regarding the responsibilities of the parties, the Commercialization Agreement states that STC is the "PATENTING LEAD," requiring it to "undertake all patenting and prosecution or other protection of the INTELLECTUAL PROPERTY." (*Id.*) Further, the Commercialization

Agreement makes STC the "LICENSING PARTY," so Sandia agreed to refrain from licensing the Intellectual Property and to refer all licensing inquiries to STC. (*Id.*) The Commercialization Agreement provides for the distribution of licensing income after cost reimbursements, with STC receiving 77.5% of the income and Sandia receiving 22.5%.[2] (*Id.* at 2). The worksheet to calculate the division makes clear that the distribution was based on the number of contributing inventors, with adjustments for patenting lead and licensing party. (*Id.* at 3).

This Commercialization Agreement was discussed by the Court in its prior order. The Court acknowledged that STC and Sandia entered into a Commercialization Agreement defining how the joint owners would work together to maintain, protect and commercialize the invention reflected in the '321 patent. (Doc. 206 at 5). The scope of the Commercialization Agreement is of central importance to the instant motion. In the Court's prior order, the Court determined that "[t]he parties did not enter into any Commercialization Agreement regarding '998, however, as STC considered itself the owner of a 100% interest in that patent." (*Id.*)

In its motion, STC asks the Court to remedy the prudential standing issue generated by the absence of Sandia, co-owner of the '998 patent, under either Section (a) or (b) of Federal Rule of Civil Procedure 19. (Doc. 218). Intel responded in opposition to the motion, and it simultaneously filed a motion to dismiss STC's claims based on the standing issue. (Doc. 226; Doc. 228). In addition to full briefing on the issues by the parties, Sandia filed a brief in opposition to STC's efforts to force it to involuntarily join this action. (Doc. 224). Sandia does not wish to become a party to the litigation because it would like to remain neutral with respect to this matter. (*Id.* at 1-2).

---

[2] Sandia has stated, and STC has not disputed, that it has only received around 0.4% of the licensing income that STC has received related to the licensing of the '321 patent and nothing related to the licensing of the '998 patent. (Doc. 239 Ex. A at 4; *see also* Doc. 225 Ex. A).

## II.        Request to Reconsider

STC asks that the Court reconsider its determination regarding ownership. District courts have inherent power to reconsider interlocutory rulings, and the Tenth Circuit has encouraged courts to do so whenever "error is apparent." *Warren v. Am. Bankers Ins. of Fla.*, 507 F.3d 1239, 1243 (10th Cir. 2007) (citation omitted). Accordingly, if a court finds that it erred in a legal or factual determination that did not result in a final judgment, it may exercise discretion and revise its ruling at any point before a final judgment is entered. FED. R. CIV. P. 54(b). Intel and STC disagreed over whether the evidence presented in support of STC's argument constitutes new evidence, but because no final judgment has been entered, that argument is irrelevant. All that is important for purposes of STC's request is whether the Court erred in determining that the '998 patent was not co-owned by Sandia prior to December of 2011.[3]

STC's request for reconsideration is based on the provision of the Atomic Energy Act, 42 U.S.C. § 5908, which automatically vests title of inventions made or conceived in the course of a contract with the DOE. (Doc. 218 at 2, 9; Doc. 235 at 8). According to STC, because of that provision, title to "all of the inventions created by the inventors" stemming from SD-5308, including both the '321 and '998 patents, automatically vested with the DOE. (Doc. 218 at 2). STC argues that the declaration of Kevin W. Bieg, senior counsel for Sandia, supports this argument. (Doc. 218 at 2). Neither Sandia nor Intel take issue with the provisions of the Atomic Energy Act, but both strongly dispute its application to the '998 patent. (Doc. 224 at 9; Doc. 226 at 6, 26-29). Both assert that the Bieg declaration solely clarifies the ownership of the '321 patent; Mr. Bieg states that the DOE automatically acquired title to the '321 patent by virtue of

---

[3] There is, nevertheless, a procedural flaw in STC's request for reconsideration. STC entirely fails to cite to any authority in support of the legal positions advanced, a requirement of this Court's Local Rules. D.N.M.LR-Civ. 7.3(a). Because this issue was not raised by the parties, the Court will proceed to address the substance of STC's argument.

Mr. Draper's employment with Sandia and Sandia's contract with the DOE. As Mr. Draper was not an inventor of the '998 patent, the United States did not acquire an interest in that patent.

The Court agrees with Sandia and Intel and finds STC's request for reconsideration meritless. In discussing the Atomic Energy Act, Mr. Bieg specifically states that Sandia provided notice to the DOE of its intent to retain title to an invention, which Mr. Bieg defines as "the invention claimed in the '321 patent[.]" (Doc. 218 Ex. B at ¶ 8). The notice that Sandia sent to the DOE and that Mr. Bieg cites specifically states that the inventor was Mr. Draper and that three other named inventors worked for UNM. (Doc. 218 Ex. B at 11). It is uncontested that Mr. Draper was not an inventor to the '998 patent. Thus, because no Sandia employee made an inventive contribution to what became the '998 patent, the DOE did not automatically obtain title to the '998 patent. Moreover, given the timing of Sandia and STC's requests with the DOE, both made over two years before the '998 patent application was filed, those requests could not have contemplated the '998 patent. STC's argument that the USPTO found the inventions of the '998 patent "identical" to those of the '321 patent (Doc. 235 at 8) has already been addressed by the Court and remains unavailing. (*See* Doc. 206 at 13-14). The automatic vesting provision of the Atomic Energy Act does not alter that analysis.

The Court denies STC's request for reconsideration.

## III.   Prudential Standing

### a.  Legal Standard

The Court is faced with the issue of whether STC has standing to bring this infringement action against Intel, given that Sandia, co-owner of the '998 patent, is not a party to the action and does not wish to join in the action. Standing, whether prudential or constitutional, is a threshold determinant of the propriety of judicial intervention, and it is a question that appellate

courts review *de novo*. *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000) (citing *Warth v. Seldin*, 422 U.S. 490, 517-18 (1975); *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1092 (Fed. Cir. 1998); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995)).

In patent law, there is a general rule that "[w]hen a patent is co-owned, a joint owner must join all other co-owners to establish standing." *Enovsys L.L.C. v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1341 (Fed. Cir. 2010) (citations omitted); *see also SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1325 (Fed. Cir. 2010) (quotation omitted) ("'Absent the voluntary joinder of all co-owners of a patent, a co-owner acting alone will lack standing'"); *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1264-65 (Fed. Cir. 2007) (same); *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1467 (Fed. Cir. 1998) (citation omitted) ("An action for infringement must join as plaintiffs all co-owners."). The joinder of co-owners is a matter of prudential standing. *Prima Tek II*, 222 F.3d at 1377. Accordingly, if one co-owner has not joined in an infringement action, as here, the plaintiff lacks prudential standing. The plaintiff bears the burden to establish that it has standing to bring an action. *See Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005).

Pursuant to Federal Rule of Civil Procedure 19, courts may order a required party to be made an involuntary plaintiff. FED. R. CIV. P. 19(a)(2). However, substantive patent law confers a right on patent owners to impede a "co-owner's ability to sue infringers by refusing to voluntarily join in such a suit." *Ethicon*, 135 F.3d at 1468 (citing *Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 345 (Fed. Cir. 1997)). Thus, involuntary joinder under Rule 19(a) is only available in two limited circumstances. *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1289 n.2 (Fed. Cir. 2008) (citing *Ethicon*, 135 F.3d at 1468). A co-owner may be

involuntarily joined if: (1) it has waived its right to refuse to join suit by agreement, or (2) it stands in a position of trust to an exclusive licensee who is attempting to bring the action. *Ethicon,* 135 F.3d at 1468 n.9 (citing *Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 469 (1926); *Willingham v. Lawton*, 555 F.2d 1340, 1344-45 (6th Cir.1977)). STC does not argue that Sandia waived its right to refuse to join; it instead contends that Sandia made STC the exclusive licensee for the '998 patent. If the Commercialization Agreement between STC and Sandia made STC the exclusive licensee, and if the Commercialization Agreement in fact covers the '998 patent, then STC may join Sandia involuntarily under Rule 19(a).

STC would prefer that the Court treat Sandia as a necessary but not indispensable[4] party pursuant to Federal Rule of Civil Procedure 19(b) based on equitable considerations. If the joinder of a necessary party is not feasible, Rule 19(b) requires the court to "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." FED. R. CIV. P. 19(b). Four factors are set out for the court's consideration, though this list is not exhaustive:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
> > (A) protective provisions in the judgment;
> > (B) shaping the relief; or
> > (C) other measures;
> (3) whether a judgment rendered in the person's absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.*

The analysis of whether a party is indispensable under Rule 19(b) is conducted by applying Tenth Circuit law. *Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266,

---

[4] As of 2007, the text of Rule 19(b) no longer includes the word "indispensable." However, that word is still frequently used in the caselaw to denote "a required party in whose absence the action cannot proceed." *N. Arapaho Tribe v. Harnsberger*, 697 F.3d 1272, 1278 n.3 (10th Cir. 2012).

1269 (Fed. Cir. 1998) ("Whether a party is indispensable under Rule 19(b) is a matter of regional circuit law . . . ."). The district court exercises discretion in determining the weight of each factor. *Thunder Basin Coal Co. v. Sw. Pub. Serv. Co.*, 104 F.3d 1205, 1211 (10th Cir. 1997). "Since evaluation of indispensability 'depends to a large degree on the careful exercise of discretion by the district court,'" the appellate court reviews 19(b) determinations for an abuse of discretion. *Navajo Tribe of Indians v. State of N.M.*, 809 F.2d 1455, 1471 (10th Cir. 1987) (quoting *Glenny v. Am. Metal Climax, Inc.*, 494 F.2d 651, 653 (10th Cir. 1974)).

### b.  Involuntary Joinder under Rule 19(a)

Involuntary joinder is only available if STC was the exclusive licensee of the '998 patent. STC asserts that the Commercialization Agreement executed in June of 2009 made it the exclusive licensee of the '998 patent. Two aspects of the Commercialization Agreement are at issue here: first, whether the Commercialization Agreement made STC an exclusive licensee, and, second, whether the Commercialization Agreement covered the '998 patent. These are essentially questions requiring the interpretation of contractual terms, and, as such, they must be evaluated under the law of the state in which the contracting occurred. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1013 (Fed. Cir. 2006) ("We review the interpretation of contractual terms under the law of the regional circuit from which the appeal arises."); *Gen. Protecht Grp., Inc. v. Leviton Mfg. Co.*, No. CIV 10-1020, 2010 WL 5559750, at *6 (D.N.M. Nov. 30, 2010). Though the parties did not address choice of law issues, it appears that the Commercialization Agreement was prepared and executed in New Mexico. Thus, the Court will apply New Mexico contract principles, *Gen. Protecht Grp.*, 2010 WL 5559750, at *6 n.7 (citations omitted), and interpret the contract by looking to the plain language of the relevant provision, "giving meaning and significance to each word or phrase within the context of the

entire contract . . . ." *H-B-S P'ship v. Aircoa Hospitality Servs., Inc.*, 114 P.3d 306, 313 (N.M. Ct. App. 2005) (citations omitted).

       i.     *Was STC the Exclusive Licensee?*

"Each co-owner of a United States patent is ordinarily free to make, use, offer to sell, and sell the patented invention without regard to the wishes of any other co-owner." *Schering*, 104 F.3d at 345 (citing 35 U.S.C. § 262). Through the Commercialization Agreement, though, Sandia relinquished some of those rights. Specifically, Sandia gave up its right to license the Intellectual Property defined in the agreement. Sandia also gave up the right to patent, prosecute, and otherwise protect the defined Intellectual Property.

STC contends that, because it is both patenting lead and licensing party for the intellectual property, it is the exclusive licensee. (Doc. 218 at 3). Sandia and Intel, on the other hand, argue that STC has confused the phrase "exclusive licensee" with "exclusive licensing agent" or "exclusive licensor." (Doc. 224 at 6; Doc. 226 at 18-19). They also raise the question of whether a co-owner can be an exclusive licensee, since co-owners do not hold patents "in trust" for one another as a patentee must for an exclusive licensee. (Doc. 224 at 6; Doc. 226 at 19). In reply, STC alleges that it provided consideration, in the form of a portion of licensing income, to Sandia in order to have the exclusive right to license the Intellectual Property. (Doc. 235 at 6). STC further asserts that there is no law that prevents an exclusive licensee from being a co-owner of the patent. (*Id.*)

Sandia may only be forced to join in this lawsuit if it has an obligation to do so, which STC asserts arose when Sandia granted it an exclusive license. When a patent owner grants such a license, he holds the patent in trust for the licensee and must permit the licensee to sue in his name. *Indep. Wireless*, 269 U.S. at 469; *Collins v. Hupp Motor Car Corp.*, 22 F.2d 27, 31 (6th

Cir. 1927). The trust relationship and the concomitant obligation of the owner to the licensee require that involuntary joinder be permitted. *See, e.g.*, *Ferrara v. Rodale Press, Inc.*, 54 F.R.D. 3, 4, 6 (E.D. Pa. 1972) (copyright).

No clear definition of an exclusive licensee is available, and the concept of an exclusive licensee is often explained by comparison to that of an assignee. This is likely because much of the relevant caselaw concerns the right of a non-owner to bring suit in his own name. *See Rite-Hite*, 56 F.3d at 1551-52; *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed. Cir. 1995). While there is no precedent that explicitly states that an owner cannot simultaneously be an exclusive licensee, neither has this Court found any decision indicating that a co-owner can be an exclusive licensee. Generally, the method for involuntarily joining co-owners to a suit is through a contractual agreement in which the co-owners waive their right to refuse to join in an infringement action. *See Ethicon,* 135 F.3d at 1468 n.9.

The Court is not inclined to expand the bases upon which a co-owner may involuntarily join another co-owner. The focus of the exclusive licensee exception is the relationship of trust between the patent owner and the exclusive licensee. When the patentee grants an exclusive right to make, use or vend the invention, the patentee agrees to hold the title to the patent in trust for the licensee. *Indep. Wireless*, 269 U.S. at 469. That relationship of trust simply does not exist between co-owners; on the contrary, co-owners are generally presumed to have opposing interests. *Cilco, Inc. v. Copeland Intralenses, Inc.*, 614 F. Supp. 431, 434 (S.D.N.Y. 1985) (citing 35 U.S.C. § 262; *Willingham v. Star Cutter Co.*, 555 F.2d 1340, 1344 (6th Cir. 1977); *Gibbs v. Emerson Elec. Mfg. Co.*, 29 F.Supp. 810, 811-12 (W.D. Mo. 1939)). Though the Commercialization Agreement between the two co-owners gave STC the exclusive right to license the patent to third parties, one among many ownership rights, it nowhere contemplated

12

that Sandia relinquished its right to refuse to join in an infringement action, another right of ownership. The Court finds that STC has not met its burden to demonstrate that it is Sandia's exclusive licensee.

ii.   Was the '998 Patent Included?

Even if the Commercialization Agreement did make STC the exclusive licensee, the Court would have to conclude that the Intellectual Property referenced therein included the '998 patent in order to find that Sandia could be involuntarily joined. STC argues that it does, based on the inclusion of the broader reference to the original disclosure form, the open-ended terms throughout the Commercialization Agreement, and practicality. (Doc. 218 at 4-6; Doc. 235 at 1-5). Sandia and Intel argue that it does not, based on the plain language of the entire Commercialization Agreement, the timing of the agreement, and the MOU on which the Commercialization Agreement was based. (Doc. 224 at 5; Doc. 226 at 10-15). The Court agrees with Sandia and Intel: to find that the Commercialization Agreement covered the '998 patent would do damage to the actual language of the agreement, reason and common sense.

The primary issue that STC faces in arguing that the '998 patent is included is the plain language of the Commercialization Agreement. The Commercialization Agreement specifically defines the covered Intellectual Property by four aspects: the technology disclosure information, the patent number, the title, and the inventors. The '998 patent is never mentioned, nor are the other inventors who participated in the invention of the '998 patent. On the other hand, the '321 patent is specifically identified in the definition of the Intellectual Property by number, title, and list of inventors. The plain language of the Commercialization Agreement also addresses the manner in which licensing income should be divided. The division is largely based on the number of contributing inventors: one from Sandia and three from UNM. The revenue split of

22.5% to Sandia and 77.5% to STC is consistent with the '321 patent but inconsistent with the '998 patent. Thus, the plain language of the Commercialization Agreement alone belies any argument that the '998 patent was encompassed in the Commercialization Agreement.

STC contends that the inclusion of the language "Technology was disclosed to STC on September 20, 1993 in SD-5308 (Sandia) /UNM-322 (STC)" is open-ended and clearly intended as a "catch-all that sweeps all patents originating from the 'technology,' into the [Commercialization Agreement], including the '998." (Doc. 218 at 4). However, as Intel notes, the invention that became the '998 patent has no Sandia technology disclosure number and a different UNM disclosure number, UNM-482. (Doc. 226 at 14). Even if that were not the case, the Commercialization Agreement's definition of Intellectual Property consists of four separate points of reference, three of which are more specific than the disclosure number. STC also argues that the use of "Intellectual Property" in the remainder of the document supports that the '321 patent was not the sole property covered. (Doc. 218 at 5). Because the Commercialization Agreement defines that phrase in unambiguous language, as discussed above, this argument is unpersuasive. STC contends that the role of patenting lead is forward looking and unnecessary if the Commercialization Agreement is limited to the '321 patent. (*Id.*) This is simply not true: other activities related to patenting could be required even after a patent issues, and the patenting lead provision explains which party is responsible for taking those actions.

The plain language definition of the Intellectual Property is consistent with the MOU executed by STC, Sandia, and UNM. That MOU set out the terms for jointly-owned inventions and works of authorship. (Doc. 218 Ex. E at 1). The MOU includes a form for use in executing commercialization agreements for jointly-owned intellectual property. (*Id.* at 9). The form includes a four-part definition for jointly-owned intellectual property: technology disclosure

14

date, title, inventors and patents/patent applications. (*Id.*) This is entirely consistent with the Commercialization Agreement and demonstrates that these agreements were intended to be less open-ended than STC's proposed interpretation.

The next flaw in STC's argument is the timing of the Commercialization Agreement. When the Commercialization Agreement was executed, the '998 patent already existed and had already been deemed a continuation-in-part of the '321 patent. The fact is, when the Commercialization Agreement was executed, STC considered itself the sole owner of the '998 patent. Thus, the only way that the Commercialization Agreement could include the '998 patent would be if the December 1, 2011 assignment to Sandia converted the June 22, 2009 Commercialization Agreement into a contract covering the '998 patent. There is absolutely no support in the plain language of the agreement for such a conversion.

STC argues that it was protecting one of the inventions originating from UNM-322/SD-5308 when it made Sandia a joint owner of the '998 patent, and that action brought the '998 patent within the scope of the Commercialization Agreement. (Doc. 218 at 6). It further contends that Intel and Sandia's limited interpretation of the Commercialization Agreement does not make practical sense. (Doc. 235). According to this argument, commercial partners would require a license to all related intellectual property so that they did not invest in one and then learn later that another license is needed for related technology. (Doc. 235 at 1). While practicality arguments might come into play if the plain language of the Commercialization Agreement was ambiguous, there is no ambiguity here. The covered intellectual property is defined by four aspects that Sandia and STC chose to include. The Court cannot eschew three of the four elements included on the face of the contract based on an after-the-fact practicality argument.

The Court concludes that the plain language of the Commercialization Agreement was limited to the '321 patent and did not include the '998 patent. Accordingly, STC's request to involuntarily join Sandia must fail.

### c.   Sandia as a Necessary but Dispensable Party

STC does not dispute that it is a basic, well-known principle in patent law that one co-owner may ordinarily block an infringement action by refusing to voluntarily join the action. However, it asks that the Court bypass this principle based on equitable considerations. According to STC, those equitable considerations include that it has no alternate route to pursue its claim; Intel would not be subjected to multiple lawsuits because Sandia has made clear that it has no intention to pursue an action against Intel; Sandia will not be harmed by its absence as evidenced by its refusal to join in the suit; and the public has a strong interest in a resolution on the merits. (Doc. 218 at 8).

As Intel points out, courts faced with multiple owner infringement actions have routinely dismissed such actions without reaching Rule 19(b) or after considering Rule 19(b) when one co-owner refuses to join. *See Israel Bio-Eng'g*, 475 F.3d at 1263-68; *Ethicon*, 135 F.3d at 1468; *Bushnell, Inc. v. Brunton Co.*, 659 F. Supp. 2d 1150 (D. Kan. 2009). This Court has found only four cases in which a federal court allowed a lawsuit to proceed without the absent co-owner based on Rule 19 considerations, and all included exceptional circumstances not present here. On two occasions, the Federal Circuit has found that an action should go forward despite an absent co-owner. *Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266 (Fed. Cir. 1998); *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470 (Fed. Cir. 1998); *Howes v. Med. Components, Inc.*, 698 F. Supp. 574 (E.D. Pa. 1988); *Catanzaro v. Int'l Tel. & Tel. Corp.*, 378 F. Supp. 203 (D. Del. 1974). In both of the Federal Circuit cases, the absent co-owners were subsidiaries or

holding companies of the named parties. *Dainippon*, 142 F.3d at 1267; *Dow*, 139 F.3d at 1471. Thus, on both occasions, the court found the subsidiary's interests were adequately protected by the parent company, and this fact weighed heavily in the conclusion that the absent co-owner was not indispensable. *Dainippon*, 142 F.3d at 1272-73; *Dow*, 139 F.3d at 1479.

In *Howes*, the absent co-owner was not subject to service of process in the court in which the action was filed. 698 F. Supp. at 577. The court did not address the right of the co-owner to stop an infringement action by refusing to join. Instead, the court focused on an affidavit received by the absent co-owner committing to be bound by the decision of the court and to not charge the defendants with the acts of infringement alleged in the lawsuit. *Id.* at 578. The court further noted that the motion was filed at a late date in litigation, after two rounds of discovery were completed and the case had already been appealed to the Federal Circuit. *Id.* at 579. In *Catanzaro*, the court considered Rule 19 to trump the provisions of substantive patent law, 378 F. Supp. at 205-06, a conclusion that is not borne out in subsequent cases decided by the Federal Circuit. *See, e.g.*, *Ethicon*, 135 F.3d at 1466-68 (holding, twenty-four years after *Catanzaro*, that co-owner's refusal to join warranted dismissal without considering Rule 19).

Keeping that precedent in mind, the Court must conduct a three part inquiry to determine whether Sandia is indispensable under Rule 19(b). *N. Arapaho Tribe v. Harnsberger*, 697 F.3d 1272, 1278 (10th Cir. 2012) (citing *Citizen Potawatomi Nation v. Norton*, 248 F.3d 993, 997 (10th Cir. 2001)). First, the Court must determine whether Sandia must be joined under Rule 19(a), or whether Sandia is a necessary party. *Id.* Then, the Court must find that Sandia "cannot feasibly be joined." *Id.* Last, the Court must determine, under the factors set forth in Rule 19(b), whether Sandia is so important to the action that the action cannot proceed in Sandia's absence "in equity and good conscience[.]" *Id.* at 1278-79 (quoting FED. R. CIV. P. 12(b)).

i.     *Necessity*

It is undisputed that Sandia is a necessary party. As discussed above, substantive patent law requires that co-owners of a patent be joined in an infringement action. Thus, all co-owners are necessary parties unless some exception applies. Because no exception applies here, Sandia is a necessary party.

ii.     *Feasibility of Joinder*

Next, the Court must consider whether Sandia's joinder is feasible. Typically, the reasons that joinder of a required party is not feasible include that the party is not subject to service of process, that joinder would deprive the Court of subject matter jurisdiction, or that the party is entitled to sovereign immunity. *N. Arapaho Tribe*, 697 F.3d at 1281; *Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1097 (10th Cir. 2003); *Citizen Potawatomi*, 248 F.3d at 997. Here, Sandia cannot be joined due to substantive patent law, which allows a co-owner to decline to participate in an infringement action. The Court has found no legal support for the proposition that joinder of a co-owner who is subject to the jurisdiction of the court is not feasible simply because the co-owner exercises its right to refuse to join; nonetheless, the Court will assume for purposes of this motion that the joinder of Sandia is not feasible.

iii.     *Indispensability*

The Supreme Court has stated that "the presence of the owner of the patent as a party is indispensable, not only to give jurisdiction under the patent laws, but also in most cases to enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all subsequent actions." *Indep. Wireless*, 269 U.S. at 468. Though the Court is reluctant to dismiss

this action without reaching the merits, given the following considerations and the dictates of substantive patent law, dismissal is required.

Sandia and Intel would both suffer prejudice if Sandia is not joined in this action. Intel would be prejudiced because it would risk multiple litigations regarding the alleged infringement of the '998 patent.[5] The statute of limitations for monetary damages on alleged patent infringement expires six years from the date of the alleged infringement. 35 U.S.C. § 286. Thus, Sandia would have ample time to commence a second lawsuit, if it chose to do so. The Court also does not find STC's position that Sandia was instructed by the DOE to take no action in this lawsuit persuasive. According to STC's exhibit, the DOE merely instructed Sandia to "take no further action with respect to license agreements or assignments." (Doc. 235 Ex. A at ¶ 3). Sandia, too, would face prejudice if this lawsuit continued in its absence. Any invalidated claims and the construction of claims could be binding on Sandia in future litigation. Moreover, an unfavorable result could reduce the value of the patent if Sandia ever wished to sell its interest. Notably, Sandia took no position on this request and did not argue that it would suffer prejudice were this action to continue in its absence. This factor weighs slightly in favor of dismissal.

It does not appear that the judgment or relief could be shaped in any manner to lessen the prejudice to Intel and Sandia. Courts are instructed to consider any measure that the party could take to avoid prejudice. FED. R. CIV. P. 19, advisory committee notes (1966 Amendments). Here, Sandia could voluntarily appear in the action and thereby avoid any prejudice. However, courts are further instructed to consider any undue hardship voluntary intervention would cause to the absent party. *Id.* Here, Sandia has a right to refuse to appear, and intervening would force it to incur substantial legal fees and contribute time to a lawsuit in which it clearly does not wish to

---

[5] STC argues that there is no risk of multiple lawsuits because Sandia would face the same standing problem. However, were the Court to conclude that Sandia was not indispensable and allow STC's interests to be fully adjudicated, Sandia could easily argue that STC would not be prejudiced by its absence in a future lawsuit.

participate. Accordingly, this factor still weighs in favor of dismissal. Furthermore, there is no action that Intel or the Court could take to lessen the potential prejudice to Intel from the possibility of multiple lawsuits.

The factor related to the adequacy of the judgment is concerned with "the interest of the courts and the public in complete, consistent and efficient settlement of controversies." *N. Arapaho Tribe*, 697 F.3d at 1283 (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S 102, 111 (1968)). If this dispute were resolved without Sandia, and without Sandia being bound to the judgment, Intel could be required to relitigate the issue with Sandia or a future assignee of Sandia's interest. That litigation would likely be before a different court and could conclude with divergent results. *See id.* This factor similarly weighs in favor of dismissal.

Finally, the court must consider whether the plaintiff has any alternative remedy. Unfortunately, because STC shares ownership of the patent with Sandia, STC is "at the mercy of" Sandia. *See Ethicon*, 135 F.3d at 1468 (quoting *Willingham v. Lawton*, 555 F.2d 1340, 1344 (6th Cir. 1977)). Thus, to acquire standing, STC must either persuade Sandia to join the lawsuit, convince Sandia to sign a contract waiving its right to refuse to join an infringement action, or obtain sole ownership of the '998 and '321 patents. Because this is only a matter of prudential standing, the ownership of the patent is only relevant at the time that the court considers standing. Thus, it would not be necessary for STC to obtain retroactive ownership.

For the reasons described above, equity and good conscience require that this action not go forward without Sandia. Accordingly, STC's motion to correct standing is denied. While this result may appear harsh, it is the result mandated by long-standing patent and procedural law. To find otherwise in a nonexceptional circumstance would be to negate one of the rights of patent ownership: to block an infringement action by refusing to participate.

**IV.    Remedy**

Due to the issue of STC's standing, Intel has moved to dismiss STC's remaining claims without prejudice. Federal Rule of Civil Procedure 12(b)(7) allows for dismissal for "failure to join a party under Rule 19." Because STC has failed to join a necessary and indispensible party, and because that party cannot be involuntarily joined, Intel's motion is granted and STC's remaining claims are dismissed without prejudice. *See Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 569 F.3d 1328, 1332-33 (Fed. Cir. 2009) (citations omitted) (holding that a dismissal for lack of standing is not an adjudication on the merits, so it should generally be without prejudice).

Remaining before the Court are Intel's counterclaims. However, it appears that Intel will face similar issues of standing if it intends to go forward. Accordingly, before the Court enters final judgment, it instructs the parties to file appropriate motions with the Court addressing the status of Intel's counterclaims within thirty days.

**THEREFORE,**

**IT IS ORDERED** that STC's Motion to Correct Standing and to Reconsider, filed June 13, 2012 (Doc. 218), is **DENIED**. Intel's Cross-Motion to Dismiss STC's Remaining Claims for Lack of Standing, filed July 10, 2012 (Doc. 228), is **GRANTED**. STC's claims for infringement after December 1, 2011 are dismissed without prejudice.

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**